# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# CHARLESTON DIVISION

IN RE: C. R. BARD, INC.
      PELVIC REPAIR SYSTEMS
      PRODUCT LIABILITY LITIGATION          MDL No. 2187

---------------------------------------------------------------

THIS DOCUMENT RELATES TO
ALL CIVIL CASES

## PRETRIAL ORDER # 127
(Motions Related to the Deposition of John Weiland)

Pending before the court are four motions related to Plaintiffs' Notice of Video Deposition of John Weiland, the President and Chief Executive Officer of C. R. Bard, Inc. ("Bard"), including the following:

1. Bard's Emergency Motion for Protective Order Precluding or Limiting and Rescheduling Plaintiffs' Deposition of John Weiland, (ECF No. 901);

2. Bard's Emergency Motion for Protective Order Limiting Plaintiffs' First Requests for Production of Documents to John Weiland in Conjunction with Deposition, (ECF No. 903);

3. Plaintiffs' Emergency Motion to Compel Production of Prior Depositions of John Weiland, (ECF No. 923); and

4. Bard's Motion to Strike Plaintiffs' Supplemental Response, or in the Alternative, Sur-reply in Support of Emergency Motion for Protective Order Limiting Plaintiffs' First Request for Production of Documents to John Weiland, (ECF No. 937).

The parties filed responses and replies, and the undersigned heard oral argument on the motions on Thursday, June 19, 2014. Having fully considered the issues, the court **GRANTS**, in part, and **DENIES**, in part, Bard's motion for a

protective order limiting and rescheduling the deposition of John Weiland; **GRANTS** Bard's motion for a protective order limiting Plaintiffs' request for production of documents related to John Weiland's deposition; **GRANTS**, in part, and **DENIES**, in part, Plaintiffs' motion to compel production of prior depositions of John Weiland; and **DENIES**, as moot, Bard's motion to strike Plaintiffs' supplemental response.

I. **Relevant Background**

This multidistrict litigation ("MDL") involves surgical mesh products designed, manufactured, marketed, and sold by Bard Urologic Division ("BUD"),[1] one of ten corporate divisions that comprise C. R. Bard, Inc. (ECF No. 902 at 6). Plaintiffs claim that the mesh products, used to treat pelvic organ prolapse and stress urinary incontinence, were defectively designed and manufactured and were sold without adequate warnings regarding their risks, dangers, and complications.

On May 5, 2014, Plaintiffs filed a Notice of Video Deposition of John Weiland, the President and Chief Operating Officer of Bard, along with a request for documents to be produced in conjunction with Weiland's deposition. (ECF No. 874). The document request designated forty-two (42) separate categories of materials to be supplied, and with attachments, was 195 pages long. Not surprisingly, Bard balked at presenting a senior corporate executive for deposition, as well as at the breadth of the document request. After trying unsuccessfully to negotiate limitations on deposition topics and on the scope of the production, Bard filed motions for protective orders.

---

[1] In 2009, Bard Urologic Division was integrated into Bard Medical Division. (ECF No. 901-1 at 3).

## II. Positions of the Parties

### A. Deposition

Bard argues that under the "apex doctrine," Plaintiffs should not be permitted to depose John Weiland ("Weiland") because (1) he is a high-level corporate executive with far-reaching responsibilities; (2) he has no unique or special knowledge of the relevant facts in this MDL, and (3) Plaintiffs have not exhausted other, less burdensome ways of obtaining the information they seek. (ECF No. 902 at 6-7). Bard contends that Plaintiffs' efforts to depose Weiland are nothing more than thinly veiled attempts to harass and inconvenience Bard. In support of this contention, Bard points out that Plaintiffs have already deposed more than forty high-ranking BUD officials, the specific BUD employees directly involved in designing, developing, manufacturing, and marketing the mesh products at issue, and plan to depose another nine former and current Bard employees that are more familiar than Weiland with the matters in dispute. (*Id.* at 6). Bard supplies Weiland's affidavit, in which he confirms that he is the President and COO of Bard, a multinational company that employs more than 11,000 people. (ECF No. 901-1). According to Weiland, he had no day-to-day role in the activities of BUD, has no day-to-day role in the activities of Bard Medical Division ("BMD"), and has no personal, unique, or special knowledge about any of the issues in this litigation. (*Id.*). Weiland reviewed the notice of deposition and request for production of documents and identified only one subject about which he had limited personal knowledge; that being, his discussions with Shakespeare Monofilament, Inc. regarding its supply of polypropylene monofilament to Secant Medical. (*Id.* at 4). Bard asserts that, at the very least, the topics raised for the first time in the document request filed by Plaintiffs should be explored through

3

other avenues before subjecting Weiland to a deposition. Bard claims that when applying the apex doctrine, Weiland's deposition should be taken as a last resort, and should be limited to Weiland's communications with Shakespeare Monofilament, Inc.

In response, Plaintiffs argue that the United States Court of Appeals for the Fourth Circuit has not adopted the apex doctrine, nor commented on its validity. Moreover, even in circuits that have adopted it, the apex doctrine does not preclude the deposition of high-ranking corporate executives. An apex employee may still be deposed when he or she has personal knowledge concerning the subject matter of the litigation, or when conduct and knowledge at the highest corporate levels are relevant to the case. (ECF No. 909). Plaintiffs contend that Weiland, who has a degree in biology, has unique and personal knowledge about various aspects of the pelvic mesh products at issue in the MDL, which he gained through his involvement on Bard's Science and Technology Committee, through receipt of monthly management reports, and as a member of Bard's Regulatory Compliance Committee. Plaintiffs claim that Weiland can testify to Bard's corporate culture in general, as well as to the specific management of its line of pelvic mesh products. They discount Weiland's claims that he lacks unique personal knowledge of the matters being litigated, describing his affidavit as "self-serving boilerplate." Plaintiffs add that they should be permitted to explore Weiland's professed lack of knowledge. Finally, Plaintiffs argue that the burden on Bard to produce Weiland must be considered in context. They emphasize that they seek to depose Weiland just once for the purpose of nearly 10,000 cases; therefore, the objectionable litigation tactics that gave rise to the apex doctrine, such as subjecting a high-ranking executive to repeated depositions, or intentionally inflating discovery costs, are not present in this case.

4

### B. *Request for Documents*

In regard to the document request, Bard raises four grounds that its claims provide good cause for a protective order. (ECF No. 904). First, Bard contends that Plaintiffs fail to limit their requests to documents pertaining to pelvic mesh. Instead, they seek virtually every document ever drafted by, reviewed, or received by Weiland, regardless of topic. Second, many of the requests include no time limitations. Consequently, they cover time periods well before Bard sold pelvic mesh products. Third, some of the requests have no apparent connection to the general subject matter of the MDL, asking for such things as documents relating to reimbursement by government health benefit plans for mesh devices sold by Bard. Finally, Bard complains that many of the requests are duplicative or cumulative of requests already made by Plaintiffs and require unnecessary re-production of documents.

Plaintiffs argue to the contrary that Bard fails to show the requisite good cause under Federal Rule of Civil Procedure 26(c) to justify issuance of a protective order. According to Plaintiffs, Bard offers only broad conclusions, unsupported arguments, and general objections. Plaintiffs also take issue with Bard's allegation that the document requests are cumulative and duplicative; particularly when, in Plaintiffs' view, Bard has yet to disclose any documents that can be directly attributed to John Weiland.

### III. Relevant Legal Principles

In general, a party is entitled to discover "any nonprivileged matter that is relevant to any party's claim or defense ... if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). For purposes of discovery, information is relevant, and thus discoverable, if it '"bears

5

on, or ... reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case. Although 'the pleadings are the starting point from which relevancy and discovery are determined ... [r]elevancy is not limited by the exact issues identified in the pleadings, the merits of the case, or the admissibility of discovered information.' Rather, the general subject matter of the litigation governs the scope of relevant information for discovery purposes." *Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (internal citations omitted).

Simply because information is discoverable under Federal Rule of Civil Procedure 26(b)(1), however, "does not mean that discovery must be had." *Schaaf v. SmithKline Beecham Corp,* 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *Nicholas v. Wyndham Int'l, Inc.,* 373 F.3d 537, 543 (4th Cir. 2004)). Federal Rule of Civil Procedure 26(b)(2)(C) allows the court, with or without a motion, to limit the frequency and extent of discovery when (1) "the discovery sought is unreasonably cumulative or duplicative;" (2) "can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (3) the party seeking the discovery has already had ample opportunity to collect the requested information; or (4) the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)((i)-(iii). This rule "cautions that all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Management, Inc.,* 285 F.R.D. 350, 355 (D. Md. 2012) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 523 (D. Md.

6

2010)).

In addition, under Federal Rule of Civil Procedure 26(c), discovery may be restricted or prohibited when necessary to protect a person or party from annoyance, embarrassment, oppression, or undue burden or expense. An order under Rule 26(c) issues upon a showing of good cause made in relation to a motion asserted by the person or party opposing the discovery. The moving party carries the burden of demonstrating the need for protection. To prevail on the grounds of burdensomeness, oppression, or breadth, the opposing party must do more to carry its burden than simply make conclusory and unsubstantiated arguments. *Convertino v. United States Department of Justice,* 565 F. Supp.2d 10, 14 (D.D.C. 2008) (the court will only consider an unduly burdensome objection when the objecting party demonstrates how discovery is overly broad, burdensome, and oppressive by submitting affidavits or other evidence revealing the nature of the burden); *Cory v. Aztec Steel Building, Inc.,* 225 F.R.D. 667, 672 (D.Kan. 2005) (the party opposing discovery on the ground of burdensomeness must submit detailed facts regarding the anticipated time and expense involved in responding to the discovery which justifies the objection); *Bank of Mongolia v. M & P Global Financial Services, Inc.,* 258 F.R.D. 514, 519 (S.D. Fla.2009) ("A party objecting must explain the specific and particular way in which a request is vague, overly broad, or unduly burdensome. In addition, claims of undue burden should be supported by a statement (generally an affidavit) with specific information demonstrating how the request is overly burdensome").

Under Rules 26(b)(2)(C) and 26(c), "the court has broad authority to limit discovery and prescribe alternative discovery mechanisms," *Minter v. Wells Fargo Bank, N.A.,* 258 F.R.D. 118, 124 (D.Md. 2009); in other words, to determine "when a

protective order is appropriate and what degree of protection is required." *Furlow v. United States,* 55 F.Supp.2d 360, 366 (D.Md.1999) (quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)). Nevertheless, protective orders "should be sparingly used and cautiously granted." *Baron Fin. Corp. v. Natanzon,* 240 F.R.D. 200, 202 (D.Md.2006) (quoting *Medlin v. Andrew,* 113 F.R.D. 650, 653 (M.D.N.C.1987)). A court's customary reluctance to constrain discovery is heightened in the case of a motion seeking to prevent the taking of a deposition. *Minter,* 258 F.R.D. at 125 (citing *Static Control Components, Inc. v. Darkprint Imaging,* 201 F.R.D. 431, 434 (M.D.N.C. 2001))("By requesting the Court to prohibit plaintiff from deposing a witness, defendant … assumes a heavy burden because protective orders which totally prohibit a deposition should be rarely granted absent extraordinary circumstances."). The reason for this is fundamental. Usually, the subject matter of a deposition is not well-defined in advance; thus, the need for prospective relief is more difficult to establish than in other methods of discovery. In addition, "a motion can be made if any need for protection emerges during the course of the examination;" therefore, a ruling prior to commencement of the deposition is not necessary to achieve a fair resolution. 8 Wright & Miller, *Federal Practice and Procedure,* § 2037 (3d Ed.). Consequently, the burden to show good cause for an order prohibiting the taking of a deposition is especially heavy. *Medlin,* 113 F.R.D. at 653; *Motsinger v. Flynt,* 119 F.R.D. 373, 378 (M.D.N.C. 1988) ("Absent a strong showing of good cause and extraordinary circumstances, a court should not prohibit altogether the taking of a deposition.")

The "apex doctrine" applies to a specific subset of deposition notices that demand the appearance of high-level executives or high-ranking government

officials. Developed to prevent a litigant from harassing or burdening a corporate or government adversary by taking depositions of its apex employees, the apex doctrine is both an expression of the proportionality requirement found at Federal Rule of Civil Procedure 26(b)(2)(C) and a presumption of good cause for a protective order under Federal Rule of Civil Procedure 26(c). *Smithfield Business Park, LLC v. SLR International Corp.,* No. 5:12-cv-282-F, 2014 WL 547078, at *1 (E.D.N.C. Feb. 10, 2014) (citing *Performance Sales & Marketing LLC v. Lowe's Companies, Inc.*, No. 5:07–CV–00140–RLV, 2012 WL 4061680, at *4 (W.D.N.C. Sept. 14, 2012)). Under the apex doctrine, before proceeding with the deposition of a high-level executive, a party must show that the executive (1) possesses special or unique information relevant to the issues being litigated, and (2) the information cannot be obtained by a less intrusive method, such as through written discovery or by deposing lower-ranking employees. *Id.* at *2.

Although the apex doctrine does not grant free passes to corporate executives to escape deposition testimony, it plainly deviates from the long-standing rule that "[a] witness ordinarily cannot escape examination by denying knowledge of any relevant facts, since the party seeking to take the deposition is entitled to test the witness's lack of knowledge." *Performance Sales & Marketing LLC,* 2012 WL 4061680, at *4. Application of the apex doctrine is also significant because it reallocates the burden that accompanies a motion for protective order. To show good cause under the apex doctrine, the moving party need only submit an affidavit from the executive stating that he or she lacks superior or unique knowledge of the relevant facts, and the burden then shifts to the proponent of the deposition to demonstrate the executive's likely knowledge and to show that less burdensome discovery methods

9

have been or will be unsatisfactory, insufficient, or inadequate. *Performance Sales & Marketing LLC,* 2012 WL 4061680, at *4 ("Put simply, the apex doctrine is the application of the rebuttable presumption that the deposition of a high-ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes "good cause" for such an order as an "annoyance" or "undue burden" within the meaning of Rule 26(c)(1). Should the deposing party fail to overcome this presumption, the court must then limit or even prohibit the deposition.")[2]

## IV. Discussion

As a general rule, an effective way to harass and abuse a large multinational corporation in litigation is to notice the deposition of one of it high-level executives. For that reason, the apex doctrine ensures that there are good faith reasons for requiring an employee at the peak of corporate management to take time out of his or her busy schedule to testify. The prerequisites to an apex deposition are simple. The executive must have unique personal knowledge of relevant facts, and the information known to the executive must not be obtainable by an easier, less intrusive method of discovery than taking his or her deposition. However, as in this case, the difficulty in applying the apex doctrine can often lie in determining what qualifies as "unique" personal knowledge. On the one hand, Plaintiffs take the position that Weiland has unique personal information on a wide range of topics given that he received monthly management reports, made technical and detailed

---

[2] *But see In Re Transpacific Passenger Air Transportation Antitrust Litigation,* No. C–07–05634 CRB (DMR), 2014 WL 939287, at *2 (N.D.Cal. Mar. 6, 2014) ("However, courts have rejected burden-shifting for high level business executive or so-called 'apex' depositions."); *Eaton Corp. v. Weeks,* No. 13–12392, 2014 WL 700466, at *7 (E.D.Mich. Feb. 24, 2014) (burden on party moving for a protective order to preclude apex deposition).

presentations to various committees regarding the pelvic mesh products, and was the recipient of information shared with only an exclusive few in the corporation. On the other hand, Bard contends that Weiland has no "superior" or "unique" knowledge about the pelvic mesh products because everything he knows about the products, he learned from individuals whom Plaintiffs have already deposed. Bard points out that the reports and minutes relied upon by Plaintiffs as proof of Weiland's knowledge were authored by others, and the statistics and summaries presented by Weiland at various meetings were based upon the work of others. Therefore, Weiland has no first-hand knowledge, and everything Plaintiffs say they want to learn from Weiland, they can, or already have, learned from other witnesses.

Regardless of whether or not the apex doctrine is adopted in the Fourth Circuit, the issues surrounding Plaintiffs' notice to depose John Weiland can be resolved by considering the proportionality principles of Rule 26(b)(2)(C). From the standpoint of convenience and burdensomeness, it clearly is difficult for the President and COO of a company the size of Bard to find time for a deposition. Weiland testifies to these facts in his affidavit, indicating that his position with Bard places extraordinary demands on his time, so much so that the earliest date on which he can sit for a full day of testimony is August 27, 2014. (ECF No. 901-1 at 5). Moreover, while Weiland is participating in the deposition, it is unlikely that another employee will be capable of covering his duties and obligations. Therefore, to justify the deposition, Weiland must be able to supply relevant information that has not and cannot be easily obtained through other witnesses, a document production, or interrogatories. Similarly, Weiland should not have to submit to a deposition that is cumulative or duplicative. According to Bard, Plaintiffs have already deposed forty

Bard employees. More importantly, Plaintiffs have deposed all of the employees with the most specific and technical information regarding the design, development, manufacturing, and marketing of the pelvic mesh products, unquestionably crucial issues in the case. Plaintiffs have not shown that Weiland has any different or additional information on any of these key points. Therefore, Plaintiffs should not be permitted to question Weiland about technical issues related to the design, development, manufacturing, and marketing of the mesh products.

Nevertheless, when considering the needs of the case, the amount in controversy, the burdens versus the likely benefits of the discovery, and the importance of the discovery in resolving the issues, there are several factors that weigh in favor of allowing a limited deposition of John Weiland. To begin with, the likely benefits of the discovery outweigh the burden. The rationale behind the apex doctrine is that, without the required showing, high-level executives will be exposed to repetitive, abusive, and harassing depositions. That concern is not present here. To the contrary, Plaintiffs propose to take Weiland's deposition just once for use in approximately 10,000 cases currently pending in this MDL and in state courts. Accordingly, the burden is minimal when viewed in the context of the MDL. The extraordinary number of cases and the astronomical amount in controversy clearly weigh against the application of a rigid apex deposition rule better suited to an "individual personal injury, employment, or contract dispute in which the 'apex' official had no personal knowledge." *In re Bridgestone/Firestone, Inc. Tires Product Liability Litigation,* 205 F.R.D. 535, 536 (S.D.Ind. 2002). Moreover, Weiland apparently had personal involvement in significant activities involving Bard's distribution of pelvic mesh products; for example, management of quality and safety

assessment, market recalls and removals. Even though other employees of Bard or BUD may have participated in these activities, Plaintiffs are entitled to discover what role senior management played in assuring the safety of products that Plaintiffs claim were unreasonably dangerous and defective; particularly, in view of documents suggesting that senior Bard officials, including Weiland, may have had ultimate responsibility for quality oversight and assurance. At some point, the involvement of a high-ranking executive "becomes less supervisory and directory and more hands-on and personal, that it is considered so intertwined with the issues in controversy that fundamental fairness requires the discovery of factual information held by the official by way of deposition." *United States v. Wal-mart Stores,* No. PJM-01-cv-152, 2002 WL 562301 (D.Md. Mar. 29, 2002). Because it is not entirely clear where that point lies with Weiland, Plaintiffs should be permitted to question Weiland about his role in the operations of BUD and BMD related to pelvic mesh products, and his actions in regard to the quality and safety of pelvic mesh products.

Plaintiffs have submitted a set of twenty-four exhibits, (ECF Nos. 909-1 through 909-24), as evidence of Weiland's unique personal knowledge of issues related to BUD's pelvic mesh. The exhibits include documents confirming that Weiland had discussions related to Shakespeare Monofilament Inc.'s polypropylene monofilament resin; minutes from Bard's Operations Review Committee; Monthly Management Reports; minutes of Bard's Science and Technology Committee regarding the Summit Project; presentations at the Annual Analyst Meeting; notes regarding government inquiries and investigations; and communications about withdrawing Avaulta products from the market. Having carefully reviewed the exhibits, the undersigned finds support for Plaintiffs' contention that Weiland has

unique personal information regarding his involvement with Shakespeare Monofilament Inc.'s supply of polypropylene monofilament to Secant Medical; his involvement in the Summit Project and his reports regarding the Project to the Board Committee on Science and Technology; his involvement in regular management meetings to assess quality systems across the organization, including the review of complaints, adverse events, and product performance; and his role in product recalls or removals.

V. <u>Order</u>

Therefore, weighing all of the considerations, the undersigned concludes that Plaintiffs should be permitted to take the deposition of John Weiland. However, the court finds good cause to limit the scope of the deposition to matters that are not cumulative, duplicative, available through other sources, irrelevant, or inflammatory. Based upon the materials supplied by the parties, questions relating to the following general topics are appropriate for the deposition of Mr. Weiland:

1. His role in regard to the daily operations of BUD and BMD, and his day-to-day obligations as President and COO of Bard.

2. His personal knowledge regarding Shakespeare Monofilament Inc.'s supply of polypropylene monofilament to Secant Medical;

3. His involvement in the Summit Project and his reports regarding the Project to the Board Committee on Science and Technology;

4. His involvement in senior management meetings to assess quality systems across the organization and/or product-related complications involving pelvic mesh, and his review of the following to the extent they involve pelvic mesh products: complaints, MDR/adverse events, product performance, division/facility

product quality profiles, new product performance, audit metrics, quality operation performance, and supplier management.

5. His involvement in investigations or follow-up related to quality/safety issues involving pelvic mesh products.

6. His role in the recalls or market removal of any mesh product.

Plaintiffs should limit their inquiry to these topics, and they are specifically admonished that questions related to felony criminal charges levied against Bard in the mid-1990's, prior to Weiland's employment with Bard, are not permitted. Likewise, questions related to a recent False Claims Act settlement are prohibited.

The deposition shall be limited to a period not to exceed **five (5) hours** and shall be taken on **August 27, 2014** at a location convenient for the witness.

Bard's motion for protective order limiting Plaintiffs' request for production of documents is **GRANTED.** The court finds Plaintiffs' request to be overly broad. More importantly, some the documents sought involve subject matter seemingly unrelated to the witness and are more appropriately requested from Bard. Now that the topics for the deposition have been determined, Plaintiffs are **ORDERED** to serve revised document requests that correspond with the approved subject matter.

Plaintiffs' emergency motion to compel production of prior depositions of John Weiland is **GRANTED,** in part, and **DENIED**, in part. Plaintiffs ask for transcripts of Weiland's testimony taken in other product liability cases, including depositions recently taken in two civil actions, one pending in the United States District Court for the District of Nevada and one pending in the Superior Court of San Diego County, California. Plaintiffs argue that Weiland's prior testimony is discoverable because it may lead to admissible evidence of his decision-making

15

responsibilities regarding product-related post-market surveillance, adverse events, and Bard's response thereto and may provide impeachment material. Bard opposes the production of the transcripts on the basis that Weiland has never testified in any cases involving pelvic mesh products; his testimony in the two cases mentioned by Plaintiffs is specific to Bard's IVC filters, which are irrelevant to this MDL; and Weiland's transcripts are protected from disclosure pursuant to a valid protective order.

The court agrees with Bard that Weiland's testimony regarding dissimilar products and product lines is not germane to this MDL. Hence, the undersigned finds no compelling reason to disturb a protective order entered by another court. Moreover, Bard should not be compelled to spend time searching for and reproducing testimony that is irrelevant to the issues being litigated in this case. Therefore, Plaintiffs' motion to compel production of prior depositions is denied as follows: Bard shall not be required to produce any portion of any deposition taken in the *Phillips* or *Giordono* cases that is marked confidential and subject to a protective order. In addition, Bard shall not be required to produce deposition transcripts of John Weiland taken in litigation other than the *Phillips* and *Giordono* cases.

Nonetheless, recent testimony by Weiland regarding his job duties and involvement with corporate divisions may be useful in streamlining his deposition in this case and should not be confidential or protected. In addition, it should be simple for Bard to collect those portions of Weiland's testimony from the *Phillips* or *Giordono* depositions. Accordingly, the court grants Plaintiffs' request for portions of the depositions in the *Phillips* and *Giordono* cases relating to Weiland's work-related activities that are not marked confidential and are not subject to a protective order.

Bard shall produce those portions of the depositions within **thirty (30) days** of the date of this Order.

Finally, the court **DENIES** Bard's motion to strike. In light of the court's granting of Bard's motion for a protective order limiting the document request, the motion to strike is moot.

The court **DIRECTS** the Clerk to file a copy of this order in 2:10-md-2187 and it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:14-cv-19706. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at **http://www.wvsd.uscourts.gov**.

**ENTERED:** June 30, 2014

_____
Cheryl A. Eifert
United States Magistrate Judge