**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

IN RE: C. R. BARD, INC., PELVIC       MDL NO.  2187
REPAIR SYSTEM PRODUCTS
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:
*ALL CASES*

---

## C. R. BARD, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY NEERAJ KOHLI, M.D. AS AN EXPERT FOR PLAINTIFFS

### I.    INTRODUCTION

Plaintiffs have named one of Bard's retained experts, Dr. Neeraj Kohli, as both a generic and case specific expert in the most recent round of disclosures.  This they cannot do.  *Rhodes v. E.I. du Pont de Nemours and Co*., 558 F. Supp. 2d 660 (S.D. W.Va. 2004).  They disclosed Dr. Kohli as an expert for Plaintiffs despite knowing full well that he has been a testifying expert for Bard in a past case, currently on appeal.  And when advised of his current consulting role in other cases, including cases in this MDL, Plaintiffs refused to withdraw Dr. Kohli as an expert. As previously recognized by this Court, the law is clear:  given Dr. Kohli's service as an expert for Bard, he should be disqualified from acting on behalf of Plaintiffs in any role in this litigation.

More specifically, Dr. Kohli testified as an expert for Bard in the first vaginal mesh trial in July 2012 in California, *Christine Scott, et al. v. Tallaikarasi Kannappan, M.D.; C. R. Bard, Inc., et al.*, pending in the Superior Court of the State of California, County of Kern, Case No. S-1500-CV-266034.  Plaintiffs' liaison counsel in the MDL is well aware of this trial testimony as he had one of his paralegals observe the entire California trial.  *Scott* is still active and on appeal, with Dr. Kohli as a disclosed expert.  Dr. Kohli also has been a retained expert for Bard in the

MDL and specifically consulted on multiple cases, including two bellwether cases.  He helped

Bard evaluate and develop its defenses, including with respect to the opinions of Plaintiffs'

experts in this litigation.  As a necessary part of this lengthy and substantial relationship with

Bard over the course of several years, Dr. Kohli was privy to multiple discussions regarding

Bard's litigation strategy, and he received confidential and privileged information at the heart of

this litigation.  Now, Dr. Kohli seeks to testify for Plaintiffs on the exact same topics he

addressed for Bard.  This Court has previously explained:

> No one seriously contends that blatant side-switching by an expert within the
> same litigation should be permitted.  In such cases…the maintenance of judicial
> integrity mandates disqualification.  Moreover, attorneys and experts in such
> circumstances could not legitimately complain that they did not know that their
> conduct was improper, as side-switching is the paradigm of inappropriate expert
> conduct.

*Rhodes*, 558 F. Supp. 2d at 666.  In this litigation, Dr. Kohli's "side-switching" creates clear and

substantial conflict of interest; therefore Bard respectfully requests the Court enter an order

disqualifying Dr. Kohli from serving as an expert for Plaintiffs and from consulting in any way

with Plaintiffs regarding Bard's pelvic mesh cases.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Dr. Kohli Was Retained By Bard As An Expert Consultant In Connection With**

**Bard's Pelvic Repair Product Liability Litigation**

Dr. Kohli is a medical doctor practicing in the field of Female Pelvic Medicine and

Reconstructive Pelvic Surgery.  *See* Rule 26 Expert Report of Neeraj Kohli, M.D., attached as

Exhibit 10.  The law firm of Nelson Mullins Riley & Scarborough LLP first contacted Dr. Kohli

in March 2010 as a potential expert in the pelvic mesh litigation for Bard.  *See* Declaration of

Taylor Tapley Daly In Support of Motion To Disqualify ("Daly Decl.") at ¶ 5, attached as

Exhibit 1.  As set forth below, Dr. Kohli agreed and was retained by Bard as a consultant for its pelvic mesh litigation, including several specific cases in the MDL and other jurisdictions.

On May 25, 2010, Bard's counsel contacted Dr. Kohli asking to retain him as an expert in in the case of *Christine Scott, et al. v. Tallaikarasi Kannappan, M.D.; C. R. Bard, Inc., et al.*, which was pending in California and involved claims related to Avaulta Plus.  *See* Daly Decl., at ¶ 8.  On June 1, 2010, Dr. Kohli confirmed he had no conflicts and would serve as an expert for Bard.  *Id.* ¶ 10.

On June 16, 2010, Bard's counsel emailed Dr. Kohli to retain him as a consulting expert in the cases of *Gail Chaplin et al. v. C. R. Bard, Inc.,* Case No. 2:10-cv-01211; *Linda Rizzo et al v. C.R. bard, Inc.* Case No. 2:10-cv-01224; and *Kelly Poltermann et al. v. C. R. Bard, Inc.,* Case No. 2:10-cv-01221, which were pending in Georgia at the time and subsequently transferred to this MDL.  *Id.* at ¶ 12.  Again, Dr. Kohli agreed to consult for Bard on those specific cases.  *Id.*

On July 12, 2010, Bard's counsel contacted Dr. Kohli to request he handle another Avaulta matter for Bard, the case of *Shelley K. Deemar v. Brian S. Retherford, M.D., et al,* Case No. 73791, pending in California.  *Id.* at ¶ 14.  Dr. Kohli agreed and engaged in multiple communications with Bard's counsel prior to the resolution of that matter.  *Id.* at ¶¶ 15-19.

On January 17, 2011, Bard's counsel contacted Dr. Kohli to ask that he consult for Bard in the case of *Ellen Locke v. C. R. Bard, Inc. et al,* Case No. 0:10-cv-60507, pending in the Southern District of Florida, which involved allegations regarding the Align product.  Again, Dr. Kohli agreed.  *Id.* at ¶ 29.

On January 20, 2011, Bard sent Dr. Kohli a formal retention letter regarding Bard's "Vaginal Mesh Litigation."  The letter generally described the litigation and stated that "[a]s well as retaining you as a general consultant in these cases, we are specifically retaining you as a

consulting expert in the cases of Christine Scott and Ellen Locke."  The letter also stated that "it may be necessary for us to disclose to you legal theories, attorney work product or other privileged, confidential, or proprietary communications or information."  The letter further stated: "[w]hether or not the agreement is terminated, you may not work for or represent any other person or entity in connection with legal proceedings involving product liability claims related to vaginal mesh products."  *Id.* at ¶ 31, Exhibit 3.  Although Dr. Kohli did not return a signed copy of the letter, he continued to consult for Bard pursuant to such retention and testified under oath in both deposition and trial that he was a retained expert for Bard.  *See* Declaration of Michael K. Brown In Support Of Motion To Disqualify ("Brown Decl.") at ¶¶ 8, 10, attached as Exhibit 2.

In June 2012, Dr. Kohli agreed to serve as Bard's expert in two of the bellwether cases in the MDL, which were not yet selected.  *See* Daly Decl., at ¶ 71.  On July 2, 2012, Bard's counsel sent another retention letter to Dr. Kohli, specifically addressing his retention "as an expert consultant in this multi-district litigation regarding Bard's Pelvic Repair System Products."  *Id.* at ¶ 74, Exhibit 4.  Although Dr. Kohli again did not return a signed copy of the letter, he agreed to, and did, continue consulting for Bard pursuant to such agreement.  *Id.* at ¶ 75.  On July 18, 2012, following his testimony in the *Scott* trial (described below), Dr. Kohli specifically agreed to be an expert for Bard in the case of *Wanda Queen, et al. v. C. R. Bard, Inc*., Case No. 2:11-cv-00012, set for trial in the MDL.  *Id.* at ¶ 79.  In August 2012, he also specifically agreed to be an expert for Bard in the case of *Carolyn Jones v. C.R. Bard, Inc*., Case No. 2:11-cv-00114, in the MDL.  *Id.* at ¶ 81.

Although Dr. Kohli was initially contacted about being a testifying expert in the *Queen* and *Jones* trials and had begun drafting his expert report for both cases, in February 2013, it was

decided Dr. Kohli would not be disclosed as a testifying expert in those matters.  *Id.* at ¶¶ 92-97, 100-102, 105.  On February 7, 2013, Bard's counsel informed Dr. Kohli of the decision not to use him as a testifying expert but asked him to continue to work on the litigation on a consulting basis.  Dr. Kohli agreed.  *Id.*

Throughout, Dr. Kohli has had numerous discussions with Bard's counsel regarding strategy, rebutting the testimony of Plaintiffs' experts and other issues.  Even after being advised that he would be a consulting (not testifying) expert witness in the two bellwether trials, there were various communications with Bard's counsel through at least July, 2013, when he consulted on the litigation.  *Id.* at ¶¶ 106-108.

**B.    Dr. Kohli Testified As A Retained Expert For Bard At Trial In An Ongoing Pelvic Mesh Case**

On January 27, 2012, Dr. Kohli was disclosed as a retained expert in the case of *Christine Scott, et al. v. Tallaikarasi Kannappan, M.D.; C. R. Bard, Inc., et al.*, pending in the Superior Court of the State of California, County of Kern, Case No. S-1500-CV-266034.  *See* Brown Decl. at ¶ 3.  In *Scott*, plaintiff alleged injury as a result of being implanted with Bard's Avaulta Plus Anterior and Posterior Biosynthetic Support Systems.  *Id.* at ¶ 4.  The *Scott* case involved many of the same allegations made against Bard in the MDL.  The case also involved allegations of malpractice by two of the plaintiffs' treating physicians.  *Id.*  Bard's Expert Witness Disclosure, which was reviewed and approved by Dr. Kohli, described the anticipated subject matter of Dr. Kohli's testimony as follows:

> Dr. Kohli will testify concerning the implantation of the Avaulta mesh products in Christine Scott, including, but not limited to the selection of Ms. Scott as a candidate for mesh products, surgical technique, surgical outcomes, and Ms. Scott's medical course thereafter.  Dr. Kohli's testimony will also cover and include issues of liability (including warnings), standard of care, causation and damages.  He will comment on

> medical literature and clinical studies relating to transvaginal mesh
> products, the FDA notices and FDA action to date relating to transvaginal
> mesh products, and how the urogynecological medical community
> interprets and utilizes these notices.

*See* Bard's Expert Witness Disclosure in *Scott*, attached as Exhibit 5.

Plaintiffs' counsel deposed Dr. Kohli in the *Scott* case on March 1, 2012.  *See* Brown

Decl., at ¶ 8.  Dr. Kohli testified that he was first contacted to be an expert for Bard sometime in

2010 and that, at the time of his deposition, he had spent close to 45 to 50 hours on the case.  He

broadly described the opinions he would be offering as "general mesh use, particularly the

opinions in this case upon my review of the medical records and, then also in my review of the

plaintiff expert, Doctor Ostergard's submissions of his expert opinion."  *See* Deposition

Transcript of Dr. Kohli, attached as Exhibit 7, at 7:10-14.

Trial commenced on June 25, 2012, and Dr. Kohli testified as a retained expert for Bard

on July 18, 2012.  Dr. Kohli testified regarding numerous issues, including but not limited to, the

use of polypropylene and transvaginal mesh kits generally, the safety and efficacy of

polypropylene generally and Avaulta products specifically, the adequacy of the warnings, the

adequacy of Bard's facilitated training sessions, the surgical technique for implanting Avaulta

Plus, the FDA public health notices regarding transvaginal mesh, the standard of care, and the

care and treatment of plaintiff.  He also specifically offered testimony to rebut opinions offered

by plaintiffs' expert, Dr. Donald Ostergard, regarding the appropriateness of polypropylene for

use in the body, the design of Avaulta Plus and its arms and whether plaintiff was injured by a

defect in the product.  *See* Reporter's Transcript of Proceedings for July 18, 2012, attached as

Exhibit 8, at pp. 2 -150.

On July 20, 2012, the jury returned a verdict for plaintiffs, attributing 60% fault to Bard

and 40% fault to the co-defendant Dr. Kannappan.  On October 9, 2012, Bard filed a Notice of

Appeal and plaintiffs filed a Notice of Cross-Appeal.  *See* Brown Decl., at ¶ 11.  Oral argument

is currently scheduled for October 23, 2014, in the Court of Appeal of the State of California,

Fifth Appellate District, Case No. F066039.  *Id.*  Therefore, the case is not yet final and may be

remanded for further proceedings, and Dr. Kohli remains a retained expert for Bard in

connection with the pending *Scott* case.

**C.     Dr. Kohli Was Privy To Confidential and Privileged Information**

As set forth in more detail in the Declarations of Taylor Daly and Michael Brown,

Dr. Kohli had numerous communications with Bard's counsel where he received confidential

and privileged information.[1]  Due to the expansive nature of his consulting role in the Bard MDL

and as a testifying expert in the *Scott* trial, Dr. Kohli was involved in many discussions regarding

general defense strategies for the litigation and many specific issues raised by plaintiffs and

plaintiffs' experts.  *See* Daly Decl. at ¶ 11.  He was part of discussions where Bard's counsel

shared mental impressions and discussed the strengths and weaknesses of various theories and

strategies.  *Id.*  There were numerous confidential and privileged discussions regarding Bard

corporate documents, Bard witnesses, Bard's product design and use, vaginal mesh

complications and mesh characteristics.  *Id.*  He also discussed and analyzed with counsel the

claims being made by plaintiffs in the vaginal mesh litigation as presented in depositions of fact

witnesses and as disclosed by plaintiffs' experts in reports and depositions.  *Id.*  Bard's counsel

relied upon Dr. Kohli's input to rebut these claims and to prepare for depositions of such

witnesses.  *Id.*  Dr. Kohli made himself readily accessible and routinely assisted with analysis of

---

[1] Due to the confidential nature of the communications between Bard's counsel and Dr. Kohli, Bard has not
attached to this Motion all of the written documentation regarding such communications.  Although many of the
details are set forth in the Declarations of Taylor Daly and Michael Brown, to the extent the Court feels it is
necessary to review additional supporting documents, Bard will agree to produce such documents for in camera
inspection.

defense issues and strategies.  As a result, Dr. Kohli became a "go to" expert to discuss issues in the litigation.  *Id.*

Although there are many examples of discussions between Dr. Kohli and Bard's counsel that involved privileged information, Bard will highlight a few here without waiving any privilege.

On February 20, 2012, Dr. Kohli met with several of Bard's attorneys from Nelson Mullins and Reed Smith in preparation for his deposition in the *Scott* case.  During this meeting, they discussed the *Scott* case and the vaginal mesh litigation in general, some general topics and some very specific to Bard, its products, its conduct and Bard's defenses in the case, including among other things, Pelvic Organ Prolapse and Stress Urinary Incontinence, historical treatment options, the value of mesh treatment, success rates, surgical outcomes with Bard products, sufficiency of the Instructions for Use, particularly the warnings that accompanied the products, training courses taught by physicians and facilitated by Bard, the role of the manufacturer in such sessions, the FDA's public health notices regarding transvaginal mesh, testing of vaginal mesh products, medical literature, the standard of care and plaintiff's medial course.  *See* Brown Decl., at ¶ 6.

As part of this discussion, counsel for Bard described the defense themes for the case as well as for the larger vaginal mesh litigation, and they discussed the relative strengths and weaknesses of each.  *Id.* at ¶ 7.  Bard's counsel also discussed potential strategies and assessed them based on Dr. Kohli's training and experience as a surgeon.  *Id.*  Dr. Kohli also worked with Bard's counsel to develop strategies for addressing the opinions of plaintiffs' experts, specifically with respect to Dr. Ostergard who was plaintiffs' primary expert in the *Scott* trial.

*Id.*  Dr. Ostergard has also been disclosed as a generic and case specific expert for Plaintiffs in the Bard MDL, and specifically for Wave 1 and Wave 2 cases.  *Id.*

Dr. Kohli also had several conference calls and meetings with Bard's counsel leading up to his trial testimony.  Again, Dr. Kohli discussed numerous confidential and privileged matters, such as theories and strategies for the case, the relative strengths and weaknesses of various issues in the litigation and options for rebutting plaintiffs' expert, Dr. Ostergard.  *Id.* at ¶ 6-7; Daly Decl. at ¶¶ 42, 49, 55, 62.  For example, on June 21, 2012, Bard's counsel talked with Dr. Kohli regarding a new article published by Dr. Ostergard and Bard's defense strategy relative to Dr. Ostergard's opinions.  *See* Daly Decl., at ¶ 72.  On June 23, 2012, Bard's counsel emailed Dr. Kohli regarding a possible strategy for responding to plaintiffs' claims about FDA clearance of Avaulta.  *Id.* at ¶ 73.  On July 11, 2012, Bard's counsel sent Dr. Kohli an analysis Bard performed following the FDA's public health notices in 2008 regarding the product warnings and the complication rates for Bard's pelvic mesh products and its competitor's products.  *Id.* at ¶ 77.  Dr. Kohli then helped Bard assess the value of such information and how to incorporate it into Bard's defense.

Following the *Scott* trial, and in connection with his consulting role in the MDL, on January 21, 2013, Dr. Kohli met with several of Bard's counsel to evaluate and discuss the opinions of plaintiffs' expert Dr. Lennox Hoyte, and to develop a strategy for the upcoming deposition of Dr. Hoyte.  *See* Daly Decl. at ¶ 99.  Dr. Kohli also discussed Bard's general defense strategy relative to Dr. Hoyte's opinions.  *Id.*  Dr. Hoyte has again been disclosed by Plaintiffs as an expert witness for Wave 1 and Wave 2 cases in this MDL along with Dr. Ostergard, Dr. Kohli and others.  *See* Plaintiffs' Designation and Disclosure of General Expert Witnesses, attached as Exhibit 9.

- 9 -

On February 4, 2013, Bard's counsel met with Dr. Kohli to discuss his opinions in the *Queen* and *Jones* cases and to assist in drafting his expert reports in those matters. *See* Daly Decl. at 102. Although he was not ultimately disclosed as a testifying expert, it was discussed that he would address the following general topics: overview of pelvic mesh, relevant medical literature relating to pelvic mesh products, the FDA Public Health notices, the safety and efficacy of Bard products, issues relating to Bard facilitated physician training and information provided by it to physicians, plaintiffs' medical course and treatment, and rebuttal to the opinions provided by plaintiffs' experts, particularly as to alleged product defects. *Id.* Because he was not used as a testifying expert in these cases, his opinions and assessments were not disclosed to plaintiffs.

**D.      Plaintiffs' Disclosure Of Dr. Kohli As A Generic And Case-Specific Expert**

On October 9, 2014, Plaintiffs served Bard with Plaintiffs' Designation and Disclosure of General Expert Witnesses Applicable to All Wave 1 and Wave 2 Cases, which identified Dr. Kohli as a general expert witness for Plaintiffs. *See* Exhibit 9. On October 9, 2014, Plaintiffs also identified Dr. Kohli as a case-specific expert witness in three cases: Barbara Carter, Barbara Campbell and Deborah White. In his expert report, Dr. Kohli offers numerous opinions on various topics including, among other things, the method of implantation of Avaulta Plus and Avaulta Solo, the adequacy of the warnings for Avaulta Plus and Avaulta Solo, the design and testing of Avaulta Plus and Avaulta Solo, surgical technique for implanting the products, the use of polypropylene mesh transvaginally, Bard's training programs, and general and specific causation issues. *See* Rule 26 Expert Report of Neeraj Kohli, M.D. attached as Exhibit 10.

On October 13, 2014, after receiving Plaintiffs' Disclosures, counsel for Bard spoke with Plaintiffs' liaison counsel in an effort to resolve this issue by having Dr. Kohli withdraw as an

expert against Bard given that he was retained as a testifying expert for Bard in the *Scott* case

and a consulting expert for Bard in the MDL and other cases.  *See* Declaration of Lori G. Cohen

("Cohen Decl."), at ¶ 3, attached as Exhibit 11.  Although Plaintiffs were aware that Dr. Kohli

was previously retained by Bard and testified for Bard in the *Scott* trial, Plaintiffs refused to

withdraw Dr. Kohli as an expert witness.  *Id.* at ¶¶ 4-5.  Plaintiffs incorrectly claimed Dr. Kohli

was "fired" as an expert for Bard and thus was permitted to testify for Plaintiffs.  *Id.*  On October

16, 2014, counsel for Bard again attempted to resolve the issue but Plaintiffs still refused to

withdraw Dr. Kohli.  *Id.* at ¶ 6.  Therefore, Bard is forced to bring this Motion to Disqualify

Dr. Kohli.

## III.    LEGAL ARGUMENT

A federal court has the inherent power to disqualify experts.  *Rhodes v. E.I. du Pont de

Nemours & Co.*, 558 F. Supp. 2d 660, 664 (S.D. W. Va. 2004) (*citing Koch Refining Co. v.

Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996)).  This power exists "in furtherance of [its]

judicial duty to protect the integrity of the adversary process and to promote public confidence in

the fairness and integrity of the legal process."  *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.

Supp. 1246, 1248 (E.D. Va. 1991).

There are two tests a court may apply in determining whether disqualification of an

expert is warranted.  Where "it is undisputed that the consultant was previously retained as an

expert by the adverse party in the same litigation and had received confidential information from

the adverse party pursuant to the earlier retention, disqualification is clear."  *Rhodes*, 558 F.

Supp. 2d at 664; *see also Wang Labs.,* 762 F. Supp. at 1248 (same).  Where such blatant side-

switching has occurred, federal courts, including this Court, have applied a bright-line rule and

disqualified the expert.  *See Rhodes*, 558 F. Supp. 2d at 670 (disqualifying expert under bright

line rule based on her role as a retained expert for opposing sides in what was functionally the same litigation); *Wang Labs.,* 762 F. Supp. at 1248 (applying bright line rule and finding "a clear case for disqualification" as expert switched sides in the same litigation); *Theriot v. Parish of Jefferson*, No. 95-2453, 1996 WL 392149, *2 (E.D. La. Jul. 8, 1996) (applying bright line rule and disqualifying expert who "for all intents and purposes … is being used by an adverse party in the same litigation"); *Howmedica Osteonics Corp. v. Zimmer, Inc*., No. 2:05-cv-00897, 2007 WL 4440173, *3 (D. N.J. Dec. 17, 2007) (applying bright line rule and disqualifying expert who switched sides multiple times within same litigation).

When the facts are less clear and the parties dispute whether the earlier retention and passage of confidential information occurred, courts may apply a two-prong test to determine whether the facts at hand warrant disqualification.  *Wang Labs.,* 762 F. Supp. at 1248; *see also Rhodes,* 558 F. Supp. 2d at 667.  Under the two-prong test, disqualification requires a showing that:  1) it was objectively reasonable for the first party who claims to have to retained the expert to conclude that a confidential relationship existed; and 2) confidential or privileged information was disclosed by the first party to the expert.  *Id.* (*citing Wang Labs*., 762 F. Supp. at. 1248).

Under both the bright line test and the two prong test, it is evident that Dr. Kohli's extensive relationship as an expert and consultant for Bard's pelvic mesh cases, both within this MDL and in other jurisdictions, requires that he be disqualified from testifying as an expert for Plaintiffs in all MDL 2187 cases.[2]

---

[2]  Also, to the extent that Plaintiffs' counsel received confidential information about Bard's pelvic mesh products and litigation strategy from consulting with Dr. Kohli, judicial integrity also requires his disqualification.  *State ex rel. Bluestone Coal Corp. v. Mazzone*, 697 S.E.2d 740, 749 (W.Va. 2010) (the court has "inherent power to do what is reasonably necessary for the administration of justice, [and] may disqualify a lawyer from a case because the lawyer's representation in the case presents a conflict of interest where the conflict is such as clearly to call into question the fair or efficient administration of justice").  As discussed throughout this memorandum, Dr. Kohli was privy to confidential and privileged information about Bard and its pelvic mesh litigation strategy.  A presumption arises that Dr. Kohli passed such confidential information on to Plaintiffs' counsel, which, if he were allowed to continue as Plaintiffs' counsel, would irreparably taint all further proceedings.  *See Cordy v. Sherwin-Williams Co.*,

A.      **Dr. Kohli's Work As Bard's Expert And Consultant Requires His Disqualification Under the Bright-Line Rule**

As set forth above, the bright-line rule requires that an expert be disqualified when he has effectively switched sides in the same litigation. *Rhodes*, 558 F. Supp. 2d at 666; *Theriot*, 1996 WL 32149 at *2. The rationale behind this rule is clear, as "no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention." *Wang Labs.,* 762 F. Supp. at 1248; *see also Rhodes*, 558 F. Supp. 2d at 666 (explaining that "blatant side-switching by an expert within the same litigation" should not be permitted); *Howmedica*, 2007 WL 440173 at *3 (same).

Courts have not only applied the bright-line rule to experts who were retained by the adverse party in the exact same case but also to those experts who were previously retained by the adverse party in substantially similar cases. For example, in *Rhodes,* the defense expert at issue had been retained by the plaintiffs in a prior case involving similar issues. 558 F. Supp. 2d at 668. Both cases involved the defendant's alleged contamination of local drinking water supplies with the same chemical and thus "involve[d] the same defendant, the same chemical, the same alleged tortious behavior … [and] share[d] the central scientific issue." *Id.* at 670. This Court found that the two lawsuits were "so intertwined with respect to their use of experts that for the purpose of expert disqualification, they functionally constituted the same case" and applied the bright-line rule to disqualify the expert. *Id.; see also Theriot,* 1996 WL 392149

---

156 F.R.D. 575, 583-585 (D. N. J. 1994) (disqualifying counsel who consulted with a side-switching expert on the grounds that "the fairness and integrity of the judicial process and plaintiff's interest in a trial free from the risk that confidential information has been unfairly used against him…outweighs Defendant's interest [in choice of counsel]").

(applying the bright-line disqualification rule when the litigation at issue was closely enough related to a prior litigation to be deemed the same case).

Here, Dr. Kohli's blatant side-switching fits squarely within the bright-line rule this Court adopted in *Rhodes*.  First, there is no dispute that Dr. Kohli was retained by Bard in the *Scott* case or that he provided testimony for Bard at the trial of that matter.  The allegations in *Scott* are virtually identical to those involved in this MDL, and Dr. Kohli provided opinions about the same Avaulta products he now seeks to opine on for Plaintiffs.  He specifically testified regarding the design of the Avaulta Plus products, the safety of the Avaulta Plus products, the adequacy of the warnings and Bard's training sessions.  He also testified about the use of polypropylene mesh products in pelvic floor repair, surgical techniques and the FDA public health notices regarding transvaginal mesh.  Moreover, Dr. Kohli helped Bard's counsel prepare for cross-examination of plaintiffs' primary expert in that case, Dr. Donald Ostergard, and also offered his own testimony to rebut Dr. Ostergard's opinions regarding Avaulta products and the appropriateness of polypropylene mesh kits for pelvic floor repair.  To be clear, Dr. Ostergard has been an expert for plaintiffs in the Bard MDL and was again disclosed as an expert witness for Plaintiffs for Wave 1 and Wave 2 cases – this time alongside Dr. Kohli.

In short, although the *Scott* case is not part of this MDL, it involves the same defendant, allegations of personal injury from the same Avaulta products, the same alleged defects, the same scientific issues regarding the use of polypropylene mesh, and at least one of the same experts.  In fact, on February 15, 2011, this Court sent a letter to Judge William D. Palmer, who was presiding over the *Scott* case, noting he was handling similar Avaulta litigation and offering to informally coordinate the efforts of MDL 2187 and the *Scott* case.  *See* February 15, 2011 letter to Honorable William D. Palmer, attached as Exhibit 6.  Therefore, for purposes of expert

- 14 -

disqualification, these cases functionally constitute the same litigation.  Moreover, since the *Scott* case is not yet resolved, it is clearly improper for Dr. Kohli to consult with Plaintiffs on the exact same issues.

Second, independent of his involvement in the *Scott* matter, Dr. Kohli should be disqualified under the bright-line rule because he was also retained as a consultant for Bard for all pelvic mesh cases and actively consulted on several cases that were part of this MDL. Specifically, the January 20, 2011, retention letter stated that Bard was retaining Dr. Kohli both "as a general consultant in these cases" and specifically "as a consulting expert in the cases of Christine Scott and Ellen Locke."  *See* Exhibit 3.  In the retention letter dated July 2, 2012, Bard expressly retained Dr. Kohli "as an expert consultant in this multi-district litigation regarding Bard's Pelvic Repair System Products."  *See* Exhibit 4.  Dr. Kohli was also specifically retained and provided consulting services to Bard in the *Chaplin*, *Rizzo*, *Poltermann*, *Queen,* and *Jones* cases, all of which were part of this MDL, as well as the *Scott*, *Locke* and *Deemar* cases in state courts.  As further explained below and in the supporting declarations, Dr. Kohli received confidential and privileged information and was part of many discussions regarding Bard's litigation strategy.  Moreover, Dr. Kohli assisted Bard's counsel in developing a strategy for responding to and cross-examining at least two of the same experts who Plaintiffs have disclosed in connection with Wave 1 and Wave 2 cases, Dr. Ostergard and Dr. Hoyte.

All of these cases involve the same defendant, the same vaginal mesh products, the same alleged tortious behavior, and share the same central issues regarding causation.  Plaintiffs cannot seriously contend Dr. Kohli may act as an expert for Bard in some MDL cases and an expert for Plaintiffs in other MDL cases.  Just as in *Rhodes* and *Theriot*, the lawsuits relating to Bard's pelvic mesh products, whether or not they are part of the MDL, are so intertwined on

- 15 -

these key issues that they functionally constitute the same case for the purpose of expert disqualification.  "[W]here, as here, an expert plainly switches sides in what is essentially the same case, the maintenance of judicial integrity requires disqualification."  *Rhodes*, 558 F. Supp. 2d at 671.  Thus, there is no question that Dr. Kohli must be disqualified from serving as Plaintiffs' expert witness for any case relating to Bard's pelvic mesh products.

**B.     Dr. Kohli Should Also Be Excluded Under The Two Prong Test As He Had Access To And Received Confidential Information As Bard's Expert And Consultant**

Given Dr. Kohli's role as Bard's expert and consultant both within this MDL and the *Scott* case, the bright line rule applies and Dr. Kohli should be disqualified from serving as Plaintiffs' expert.  However, even if the Court applies the two-prong test, the outcome remains the same.[3]

Under the first prong of the two-prong test, the Court must determine whether it was objectively reasonable for Bard to conclude that a confidential relationship existed.  Courts have held that where "the record supports a longstanding series of interactions which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like" a confidential relationship exists.

---

[3] To the extent that Plaintiffs contend that Dr. Kohli should not be disqualified because the consulting relationship was "terminated" by Bard (or as Plaintiffs' counsel put it during Bard's meet and confer attempts, he was "fired"), that assertion is not only false, but has no bearing on whether Dr. Kohli should be disqualified.  Even if the consulting relationship ended—and it has not—Dr. Kohli still received confidential information from Bard. Moreover, almost any case where this issue would arise will necessarily involve a situation where the expert's relationship with the original retaining party has ended and the courts have consistently disqualified such experts if they received confidential information as part of the original retention.  *See Koch Refining*, 85 F. 3d at 1181("[plaintiffs] had a reasonable expectation of confidentiality with [the expert] and such expectation continued after [the expert] was 'discharged' by [plaintiffs]"); *Rhodes*, 558 F. Supp. 2d at 670 (expert disagreed with plaintiffs' methodology and did not testify on their behalf in the first litigation, but was disqualified as an expert for an opposing party in a later substantially similar case); *Wang Labs.*, 762 F. Supp. 1246 (expert informed plaintiffs he was not interested in pursuing the matter as a consultant on their behalf prior to being retained for the opposing side, but was disqualified due to his receipt of confidential information).  In addition, as set forth above, although Bard decided not to use Dr. Kohli as a *testifying* expert in the MDL, Bard never terminated its consulting relationship with Dr. Kohli and in fact, expressly sought to continue that relationship.  In addition, Dr. Kohli remains a disclosed expert in the ongoing *Scott* case in California.

*Rhodes,* 558 F. Supp. 2d at 667 (*quoting Koch Refining*, 85 F.3d at 1182).  Here, there is no doubt that a confidential relationship existed between Bard and Dr. Kohli.  First, it is undisputed that Dr. Kohli testified as a retained expert for Bard in the *Scott* case.  Second, although has not yet testified for Bard in the MDL, Dr. Kohli was retained to consult for Bard in the MDL generally and specifically with respect to the *Chaplin*, *Rizzo*, *Poltermann*, *Queen,* and *Jones* cases.  In fact, Dr. Kohli began drafting an expert report for the *Queen* and *Jones* cases before it was decided he would not be used as a testifying expert.  Therefore, it was objectively reasonable for Bard to conclude that a confidential relationship existed with Dr. Kohli.

The second prong of the test requires the court to consider whether the expert received or had reasonable access to confidential information.  *Rhodes*, 558 F. Supp. 2d at 667; *Wang Labs.*, 762 F. Supp. at 1248.  In the context of expert disqualification, confidential information includes, among other things:  "discussions of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Rhodes*, at 667 (*quoting Koch Refining*, 85 F.3d at 1181).

Here, by the very nature of his extensive consulting relationship with Bard, Dr. Kohli was privy to confidential information and had many discussions with Bard's counsel regarding litigation strategies.  Specifically, Dr. Kohli talked with Bard's counsel multiple times in preparation for his deposition and trial testimony in the *Scott* case.  He was part of discussions regarding Bard's theories of the case and defense themes for the larger vaginal mesh litigation, including the relative strengths and weaknesses of each.  He also discussed potential strategies developed by the attorneys and assessed them based on his training and experience as a surgeon. He also helped Bard assess the opinions of plaintiffs' primary expert in that case, Dr. Donald

- 17 -

Ostergard, and develop a strategy for cross-examination and rebuttal testimony.  These are exactly the type of confidential discussions that warrant disqualification, especially since Dr. Ostergard continues to be an expert for plaintiffs in this MDL.

In addition, Dr. Kohli consulted with Bard's counsel regarding multiple other cases, including cases in this MDL.  In addition to evaluating case specific issues, Dr. Kohli reviewed and discussed select company documents that Bard's counsel determined were important to Bard's defense.  *See Rhodes*, 558 F. Supp. 2d at 671 (acknowledging that the document selection process represents mental impressions of the party's counsel).  Dr. Kohli also participated in discussions regarding general litigation strategies, defenses and themes, as well as preparation for depositing plaintiffs' experts, Dr. Ostergard, Dr. Hoyte, and others.  He was responsive and engaged, and became a "go to" expert to discuss litigation issues regarding pelvic mesh.  The issues that were discussed with Dr. Kohli are far reaching and include most of the key issues in this litigation including, among other things, the safety and efficacy of Bard products, the adequacy of the warnings, the design and testing of the products, surgical techniques for implanting the products, the use of polypropylene mesh in general, the adequacy of Bard facilitated training programs, and general and specific causation issues.  *See* Daly Decl., at ¶¶ 8, 17, 22, 26, 34-36, 42, 46, 49, 54, 62, 78, 86, 91-92, 99, 102; Brown Decl. at ¶¶ 6-7.  Not only does Dr. Kohli know Bard's assessment of the relative strengths and weaknesses of the issues in each of these categories, Dr. Kohli helped Bard develop its defense strategy on each of these topics.  Now Dr. Kohli seeks to testify for Plaintiffs on these exact same issues.  *See* Dr. Kohli's Rule 26 Report at Exhibit 10.  In this context, there can be no reasonable dispute that Dr. Kohli received confidential and privileged information from Bard's counsel that is highly relevant to the ongoing litigation.  No experienced litigator would freely disclose Bard's strategy

discussions with Dr. Kohli to opposing counsel. *See Wang Labs.,* 762 F. Supp. at 1249. Therefore, Dr. Kohli should be disqualified from serving as an expert for Plaintiffs in this litigation.

Finally, disqualifying Dr. Kohli as Plaintiffs' expert also complies with the policy objectives underlying expert disqualification, including preventing conflicts of interest, maintaining the integrity of the judicial system and maintaining accessibility to experts. *Rhodes*, 558 F. Supp. 2d at 667-668; *see also Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994) (in addition to applying the two-part test, courts may balance policy objectives in determining expert disqualification). It is undisputed Dr. Kohli was a retained expert for Bard and testified for Bard at the first pelvic mesh case to go to trial. Moreover, the *Scott* case is still on appeal and may be remanded for further proceedings. In this context the appearance of a conflict of interest is obvious and the details set forth above only further demonstrate that conflict is real and substantial. Also, Plaintiffs' counsel was aware of this prior retention because he had one of his paralegals sit through the entire California trial. In fact, Plaintiffs used the trial transcript from *Scott* when cross-examining witnesses during the *Donna Cisson* trial in this MDL. *See* Cohen Decl., at ¶ 4. Nonetheless, plaintiffs chose to retain Dr. Kohli in addition to their multiple other experts in this litigation. Basic fairness mandates disqualification, as does the objective of maintaining the integrity of the judicial system. In addition, Plaintiffs have disclosed eight other urogynecology experts for Wave 1 and Wave 2 cases, including Dr. Abraham (Nick) Morse, who is Dr. Kohli's partner at Boston Urogyn. *See* Plaintiffs' Disclosures, Exhibit 9. Dr. Kohli is just one of many urogynecology experts and Plaintiffs will not be unduly burdened by his disqualification.

### IV.    CONCLUSION

As set forth in detail above, Dr. Kohli has been a consultant for Bard in connection with Bard's pelvic mesh cases both in this federal MDL and elsewhere since 2010.  He also specifically testified at trial as a retained expert for Bard in the *Scott* case in California, which is on appeal and may be remanded for further proceedings.  There can be no serious dispute that a confidential relationship existed between Bard and Dr. Kohli or that Dr. Kohli received confidential and privileged information as part of his work for Bard on these matters.  Therefore, there is a serious and substantial conflict of interest, and Bard respectfully moves this court to disqualify Dr. Kohli from serving as an expert witness or consultant for Plaintiffs in this litigation.

Dated: October 21, 2014                         /s/ Michael K. Brown
                                                                Michael K. Brown
                                                                REED SMITH LLP
                                                                355 South Grand Avenue, Suite 2900
                                                                Los Angeles, CA  90071-1514
                                                                (213) 457-8000
                                                                (213) 457-8080 (facsimile)
                                                                mkbrown@reedsmith.com

                                                                Lori G. Cohen
                                                                GREENBERG TRAURIG, LLP
                                                                Terminus 200
                                                                3333 Piedmont Road NE, Suite 2500
                                                                Atlanta, Georgia 30305
                                                                (678) 553-2100
                                                                (678) 553-2386 (facsimile)
                                                                CohenL@gtlaw.com

                                                                Richard B. North, Jr.
                                                                NELSON MULLINS RILEY &
                                                                SCARBOROUGH LLP
                                                                201 17th Street NW, Suite 1700
                                                                Atlanta, GA  30363

(404) 322-6000
(404) 322-6050 (facsimile)
Richard.north@nelsonmullins.com

Melissa Foster Bird
NELSON MULLINS RILEY &
SCARBOROUGH LLP
949 Third Avenue, Suite 2500
Huntington, West Virginia 25701
(304) 526-3503
(304) 526-3543 (facsimile)
Melissa.fosterbird@nelsonmullins.com

*Attorneys for Defendant C. R. Bard, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ Michael K. Brown
Michael K. Brown
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071-1514
(213) 457-8000
(213) 457-8080 (facsimile)
mkbrown@reedsmith.com

*Attorneys for Defendant C. R. Bard, Inc.*