IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: C.R. BARD, INC., PELVIC REPAIR
SYSTEM PRODUCTS LIABILITY LITIGATION     MDL NO. 2187

-------------------------------------------------------------------
THIS DOCUMENT RELATES TO ALL CASES
_____)

## PLAINTIFFS' RESPONSE IN OPPOSITION TO C.R. BARD, INC.'S MOTION TO DISQUALIFY NEERAJ KOHLI, M.D.

COME NOW, the Plaintiffs in the above-styled MDL, and file their Response in Opposition to C.R. Bard, Inc.'s Motion to Disqualify Neeraj Kohli, M.D., and show the following:

## Introduction

Plaintiffs respectfully request that the Court hold a hearing on this motion, and that the Court conduct an *in camera* examination of Dr. Kohli, so that the issues raised in this motion can be addressed directly.

Dr. Kohli worked with Bard as a testifying expert in a California state court case, which involved a product liability claim regarding an Avaulta Plus against Bard and malpractice claims against the implanting physician. (Kohli Declaration, ¶ 2). The purpose for which Dr. Kohli was utilized by Bard in that case, as he testified there, was to review plaintiff medical records and to give opinions on the medical standard of care and causation specific to that case. *Id.*, ¶¶ 2, 4. He also rebutted opinions from the plaintiff's urogynecologist expert based on his own knowledge and experience with transvaginal POP mesh. *Id.*, ¶¶ 2, 5. Bard also sought to have Dr. Kohli provide testimony as a causation/standard of care expert in cases pending in this MDL. *Id.*, ¶ 10.

In October 2012, Dr. Kohli published an article in which he explained that the data regarding the use of transvaginal mesh for pelvic organ prolapse repair is controversial and

incomplete, and in which he discussed increasing concerns regarding the serious complications associated with these products. (Kohli Decl., **Ex. C**).  Because of this article, Bard's attorneys advised Dr. Kohli that he would not be used further as an expert. *Id.*, ¶ 12.  After this termination, Dr. Kohli never agreed to continue in any consulting relationship with Bard. *Id.*, ¶ 14.

Dr. Kohli has never signed any retainer or consulting agreement, or any confidentiality agreement, with Bard relating to any litigation expert work.  (Kohli Decl., ¶ 15). Dr. Kohli has never Bard billed for or received payment from Bard for any litigation expert work. *Id.*, ¶ 16. Dr. Kohli explains that he has never discussed strategy with Bard's counsel other than perhaps the "strategy" of trying to show that the Bard product did not cause the patient's injury in a given case. *Id.*, ¶¶ 4, 10, 17, 22.

While Bard's motion insinuates that Dr. Kohli has somehow changed his position or opinions to "play both sides" to some unfair advantage, Dr. Kohli explains:

(1) He had no agreement with Bard that would restrict or limit him from working with Plaintiffs or any other party, and, he received no confidential information from Bard and he has breached no confidentiality;

(2) Bard failed to give him information that he now knows was possessed by Bard which bears on the safety and efficacy of its pelvic mesh products that he feels should have been disclosed to him during his time as a Bard preceptor, as well as during the time he was involved in the California state court case, which information would have caused him to reevaluate his use of Bard's products and his relationship with Bard if he had known; and,

(3) Dr. Kohli's own clinical experience, as well as his knowledge and familiarity with the published medical literature and the experience of other physicians across the country, has forced him to reevaluate his position with respect to the use of transvaginal mesh kits for pelvic organ prolapse repair.

(Kholi Decl., ¶ 21).

## Statement of Factual and Procedural Background

### Dr. Kohli testified for Bard as a case-specific causation/standard of care expert, and he rebutted the plaintiff's expert based on his knowledge and experience, in *Scott v. Tillaikarasi, et al.*

In 2010, several months prior to the formation of this MDL proceeding, Dr. Kohli was contacted by Bard to serve as an expert in the case of *Christine Scott and Roy Scott v. Tillaikarasi Kannappa, M.D., Gregory Klis, M.D., and C.R. Bard, Inc.* (hereinafter, *Scott*), which was filed in the Kern County, California Superior Court.  As Bard's briefing explains, *Scott* was a medical malpractice case, as well as a product liability case, arising from an Avaulta Plus implantation.  Although Bard's present motion attempts to portray his role as something more, the evidence reveals that Dr. Kohli's role in the *Scott* case was as a medical standard of care/specific causation expert.  Dr. Kohli was later asked by Bard to rebut the plaintiffs' expert, Dr. Donald Ostergard, regarding Bard's Instructions for Use ("IFU"), Bard's physician training, and the general suitability of the Avaulta Plus, based on Dr. Kohli's knowledge and experience. (Kohli Decl., ¶¶ 2, 5).  While Ms. Daly says that Dr. Kohli was furnished unspecified "Bard corporate documents" in connection with his work in the *Scott* case, she does not contend in her declaration that Dr. Kohli received any specific documents in connection with his work in any case that should in fact be considered "confidential."[1]

In his deposition taken in *Scott*, Dr. Kohli testified that the expert opinions he intended to offer at trial related to "general mesh use, particularly the opinions in this case upon my review of the medical records" and "in my review of the plaintiff expert, Doctor Ostergard's submission of his expert opinion." (Dkt. No. 1106-1, p. 51).  In describing his "general mesh use" opinions, he explained that he has experience with the Avaulta procedure, which he said he found to be

---

[1] Ms. Daly does not contend in her declaration that Dr. Kohli was sent any Bard documents in connection with any MDL case prior to Bard terminating its relationship with Dr. Kohli on February 7, 2013.

"safe and effective when used properly." *Id.*, p. 52. He explained that proper patient selection, postoperative management of complications, and surgeon skill, training, decision-making and competence are important. *Id.*, p. 52. Dr. Kohli then explained that, in his opinion, Ms. Scott was "not necessarily the best candidate for comprehensive mesh use," and that "[s]he had significant complications due to the technique of implantation but more importantly due to the postoperative management with multiple surgeries when maybe more aggressive management should have been done." *Id.*, pp. 52-53.

At trial, upon questioning from Bard's counsel, Michael Brown (who filed this motion), Dr. Kohli was asked to explain what he was asked to do in the *Scott* case, and what materials that he was provided and relied upon:

> Q. Thank you. We'll get into your background in a little bit. But let me first state, you were retained as an expert by us on behalf of C.R. Bard in this case. Correct?
> A. Correct.
> Q. What were you asked to do?
> A. I was asked to review records and render an opinion as to the standard of care regarding this case, particularly.
> Q. And what other types of information did you review in coming up with your opinions in addition to medical records?
> A. I reviewed the actual records in the office in the operative notes, I reviewed depositions I reviewed any exhibits that were submitted to me. And I did them in the framework of my current knowledge base.
> Q. And did you review, as part of your review of the case, the Avaulta Plus instructions for use?
> A. I did.

Dkt. No. 1106-1, p. 64 (Dr. Kohli *Scott* trial testimony).

On direct examination by Bard's counsel in the *Scott* trial, Dr. Kohli also described the Avaulta product and its design features, and explained how it is intended to be implanted and function in the body; his experience as a proctor in the Bard physician training program; he stated that the complications experienced by Ms. Scott were included in the Avaulta IFU; he discussed his experience with pelvic mesh generally and Avaulta specifically; he discussed a

4

published medical article that he recently co-signed relating to pelvic repair mesh; and, he testified at length about the medical care and treatment of Ms. Scott and the cause of Ms. Scott's injuries. (*See generally*, Dkt. No. 1106-1, pp. 56-148).

<u>Bard sought to have Dr. Kohli serve as a testifying expert in certain MDL cases</u>

Bard also sought to have Dr. Kohli provide testimony as an expert in two cases that were pending in this MDL (Wanda Queen and Carolyn Jones), and Ms. Daly claims in her Declaration that Dr. Kohli was sent medical records, depositions, plaintiffs' expert reports, and plaintiffs' expert depositions in those two cases.[2]  Both of these cases have now resolved.

Dr. Kohli explains that his involvement in MDL cases, much like he testified he was asked to do in the *Scott* case, was to review medical records and to offer opinions regarding causation based on records and testimony specific to those cases. (Kohli Decl., ¶¶ 10, 22).  Dr. Kohli explains that any discussions that he had with Bard's counsel regarding the *Queen* and *Jones* MDL cases (both of which are now resolved) involved his review and analysis of medical records in those cases, and his providing his thoughts and opinions regarding causation of the injuries claimed by the plaintiffs in those cases. *Id.*, ¶ 10.

Dr. Kohli also states in his Declaration that he was asked by Bard's counsel generally what he knew and could tell them about two of the urogynecologists named as experts by the plaintiffs in the initial MDL bellwether cases, Dr. Lennox Hoyte and Dr. Bobbie Shull, and he was asked for input regarding their expert reports. (Kholi Decl., ¶ 8).

<u>Bard terminated Dr. Kohli's services as an expert based on a published article about concerns with transvaginal pelvic organ prolapse mesh kits</u>

---

[2] Ms. Daly mentions three cases filed in the Northern District of Georgia, which were later transferred to the MDL, but Dr. Kohli states that he never received any records relative to any of these cases, and never had any substantive discussions with any Bard attorney relative to these cases. (Kohli Decl., ¶ 9).

In October 2012, Dr. Kohli published an article entitled "*Controversies in utilization of transvaginal mesh*" in the peer-reviewed medical journal, Current Opinion in Obstetrics and Gynecology, a copy of which is attached to Dr. Kohli's Declaration as **Ex. C**.  Dr. Kohli's article stated that "[w]ith introduction of commercially available kits and widespread adoption of these procedures amongst pelvic surgeons and general gynecologists, there is increasing concern regarding related complications including mesh exposure, dyspareunia/pelvic pain, infection and organ injury.  This has resulted in recent reappraisal of vaginal mesh use, increased medicolegal risk, and withdrawal of selected products." *Id.* In the summary of his article, Dr. Kohli states "[t]he data regarding transvaginal mesh use are controversial and incomplete.  Its use is still in its infancy in terms of material development and clinical/scientific study, and clinicians should be careful and judicious in its use." *Id.*  Under the section entitled "Conflicts of interest," Dr. Kohli stated that he "has no conflict of interest in the writing of this article with respect to industry relationships, consulting agreement, grants, or any other type of financial support." *Id.*; *See also*, Kohli Decl., ¶ 12.

On February 7, 2013, one of Bard's attorneys, Taylor Daly, who had been Dr. Kohli's primary point of contact, e-mailed him with the subject line "An issue has arisen and I need you to stop work on the report." A copy of this e-mail is attached to Dr. Kohli's Declaration as **Ex. B**; *See also*, Kohli Decl., ¶ 12.  The e-mail stated that "I will explain in detail….You do not have a report due Monday so stop." *Id.*  When she spoke with Dr. Kohli that day about her "stop work" e-mail, Ms. Daly explained that Bard's attorneys were unhappy with Dr. Kohli's article, and they had directed her to terminate Dr. Kohli's work as an expert for Bard. *Id.*  Ms. Daly told him that she disagreed with the decision but that the matter was out of her hands, and that the decision had been made based on the article. *Id.*  Contrary to the statement in Ms. Daly's Declaration, Dr.

Kohli never agreed to continue in any consulting relationship with Bard after Bard terminated his services based on his article. *Id.*, ¶ 14.

<u>Dr. Kohli never received any confidential information from Bard</u>

Bard never provided Dr. Kohli with any confidential documents (Kohli Decl., ¶¶ 4, 8, 22), and Bard does not specifically contend otherwise.  Nowhere in the declarations of Bard's counsel is there any identification or discussion of any specific "confidential" documents or materials.  The sole contention in the briefing and supporting attorney declarations that Dr. Kohli received any "confidential" information would appear to be Bard's counsel claims that they generally discussed with Dr. Kohli "mental impressions, [and] confidential and privileged information about Bard's defense strategies," and "Bard's theories of the case and defense themes for the larger vaginal mesh litigation, including the relative strengths and weaknesses of each." (Daly Declaration, ¶ 11; Brown Declaration, ¶¶ 7, 9).[3]

Despite the allegations of revelation of "work product" and "defense strategies" in Bard's attorney declarations, the objective facts prove otherwise.  As set forth above, Dr. Kohli testified in *Scott* that his role was to review medical records and depositions and to provide an opinion on the standard of care (causation), and to rebut the plaintiff's physician expert's opinion based on his knowledge and experience.  (Dkt. No. 1106-1, pp. 51-53; Dkt. No. 1106-1, p. 64; *See also*, Kohli Decl., ¶¶ 2, 4-5).

---

[3] Dr. Kohli denies any discussion of "strategy" with Mr. Brown, and states that the only conversations he had with Mr. Brown were in preparation for his deposition and trial testimony in *Scott*, and related to the subject matter to which he testified in *Scott*. (Kholi Decl., ¶ 17). While Mr. Brown broadly alleges that he discussed with Dr. Kohli "Bard's theories of the case and defense themes for the larger vaginal mesh litigation," it should be noted that attorney Brown was not involved in the Bard MDL at that time of his interaction with Dr. Kholi.

After Bard had terminated Dr. Kohli's services as an expert (and perhaps recognizing the potential ramifications of that decision), Bard's counsel reached out to him again by e-mail on July 22, 2013 and stated as follows:

> Dr. Kohli, I hope you and your family are all doing well. **We continue to get more mesh cases and continue to need consulting experts to look at some of the cases and give us their opinions about what went wrong, when and what was the cause. This would not require you to write a report or to be the testifying expert, <u>rather you [sic] what you have done on a number of cases for us and look at records only and talk with us about them</u>**. Do you have any time or interest in doing this? It is an awkward request given our last call so I would like to talk with you briefly about it.

A copy of this e-mail is attached to Dr. Kohli's Declaration as **Ex. D** (Emphasis added); *See also*, Kohli Decl, ¶ 13.[4]

This statement from Bard's counsel embodies Dr. Kohli's role vis-à-vis Bard and the cases in which it sought his input, and it corresponds directly with what Dr. Kohli explained under oath in *Scott*.

Dr. Kohli explains in his Declaration that the only defense "theme" or "theory" that he discussed with Bard's counsel was that the complications suffered by women implanted with pelvic organ prolapse mesh kits were the result of either doctor error or pre-existing conditions with the patient, or both, or else were complications that Bard warned about. (Kohli Decl., ¶¶ 10, 22).

## <u>Argument and Citation of Authority</u>

While Bard attempts to portray Dr. Kohli's role as something more, and claims that he was privy to "confidential" information, the facts disclose that Dr. Kohli was asked by Bard to

---

[4] Dr. Kohli explains that he never had any subsequent conversation with Ms. Daly or any other Bard attorney after this e-mail, and he never consulted or agreed to consult with Bard after this. (Kohli Decl., ¶¶ 13-14). Dr. Kohli's first communication with Plaintiffs' counsel did not come until October 2013, eight months after his services as an expert were terminated by Bard. Aside from telling them generally what he was asked by Bard to do, and how his services were terminated by Bard, Dr. Kohli states that he has not discussed with Plaintiffs' counsel the details of any conversations that he has had with Bard's attorneys, other than as specifically set forth in his Declaration. (Kholi Decl., ¶¶ 19-20).

provide medical causation testimony based on his review of patient-specific records, and later to rebut opposing expert testimony based on his own knowledge and experience as described above.  Dr. Kohli authored an article that discussed the controversy and concerns regarding serious complications associated with transvaginal mesh kits used for POP repair, and the incomplete data regarding these products, which resulted in Bard terminating his services. (Kohli Decl., ¶ 12).  This is hardly the sort of endorsement one would expect from an alleged "go-to" defense expert who was allegedly helping develop "defense strategies" and "defense themes" generally.

Dr. Kohli is one of this country's preeminent urogynecologists, and his interests lie in sharing the truth about what he now knows and understands about these products.  Dr. Kohli's opinions regarding the use of transvaginal mesh kits for POP repair have evolved with his own clinical experience and knowledge, and are consistent with his published article that caused Bard to terminate his services. (Kohli Decl., ¶ 21).  Dr. Kohli unequivocally states that he did not develop any opinions that he would intend to offer in these cases based in any way on any information provided to him by Bard's counsel. *Id.*, ¶¶ 4, 22.

Bard's efforts should be recognized for what they are, and that is to prevent the revelation that one of its former proctors, a nationally renowned urogynecologist who taught and trained countless others to use Bard's products, was never given information that Bard had that bears on the safety and effectiveness of its products.  Bard does not want Dr. Kohli's opinions to come to light that are set forth in his article that led Bard to terminate its relationship with him.  Bard also does not want Dr. Kohli to be able to testify to his conversations with Bard's employees and executives about the use of armed, trocar-based mesh kits, and about the indiscriminate training of physicians to use these products.

<u>Legal standard of review</u>

"[D]isqualification [of an expert] is a drastic remedy that courts should use sparingly…. The burden of showing that disqualification is warranted rests with the party seeking disqualification and requires a 'high standard of proof.'" *In re American Medical Systems, Inc. Pelvic Repair Systems Prods. Liab. Litig.*, MDL No. 2325, Pretrial Order #91 (Motion to Disqualify Catherine A. Matthews, M.D.).

**A. Bard cannot satisfy its burden of proving a confidential relationship with Dr. Kohli that could be deemed to disqualify him from serving as an expert for the plaintiffs in these cases, and furthermore, Bard cannot meet its burden of proving that it disclosed specific confidential information to Dr. Kohli, the disclosure of which would prejudice its interests.**

The operative facts bearing on this motion to disqualify Dr. Kohli are remarkably similar to those presented in an MDL proceeding from the Northern District of Georgia, *In re Androgel Antitrust Litig.*, 2011 WL 1882516 (N.D.Ga.2011). There, law firms representing two antitrust defendants had previously entered written retention agreements containing confidentiality provisions with two separate experts in the patent litigation giving rise to the antitrust case. *Id.* at *1. One of the defense law firms involved was Greenberg Traurig ("GT"), lead counsel for Bard in this MDL. *Id.* GT had a six-month relationship with a consulting expert during which it was billed for – and it paid for – 24 hours of consulting work. *Id.* GT alleged that it had discussed issues relevant to the litigation and "shared our own developing mental impressions, legal analysis, and case strategy with her." *Id.* Another defendant's law firm in the MDL had a signed retainer/confidentiality agreement with a separate expert in the underlying patent case, was billed for and paid for ten hours, and claimed "that it shared mental impressions, legal analysis, and litigation strategy with [the expert]." *Id.* When the plaintiffs in the antitrust litigation later retained the two former defense experts, the defendants moved to disqualify them. The MDL

10

court in *In re Androgel* denied the disqualification motions on several grounds, and its reasoning applies here.[5]

The court noted that it was reasonable for GT and its client to believe that it had a confidential relationship with its former expert because of the existence of the written confidentiality agreement, and because communications with a non-testifying consultant are generally afforded more confidentiality than those with a testifying expert.  *In re Androgel*, 2011 WL 1882516, *3.  Nonetheless, the MDL court denied the motion because GT's "bald assertion" that "mental impressions, legal analysis and case strategy" were disclosed to the expert were "not sufficiently specific to establish that [GT's client] disclosed confidential information." *Id.*  The court also denied the other defendant's motion to exclude its former expert because it "has not produced specific evidence or communications showing that [the former expert] received confidential information during the [underlying] litigation." *Id.* at *5.  Instructively, the court in *Androgel* observed "[i]ndeed, [the defendant] admits that it did not give [the expert] any confidential written documents," and instead "broadly claim[ed] that it 'laid out specific elements of its litigation strategy.'" *Id.* at *5.

The facts germane to this motion are even stronger than those in *In re Androgel* which led the court to deny the motions to disqualify there.  Here, unlike in *Androgel*, Bard never had any written retainer or confidentiality agreement relating to expert litigation work with Dr. Kohli at any time. (Kohli Decl., ¶ 15).[6]  Also, unlike in *Androgel*, Dr. Kohli never billed Bard for or

---

[5] Notably, the Court in *Androgel* did not apply any "bright line" test even though the consultants were engaged by the opposing side in the underlying patent litigation giving rise to the subject antitrust case, which involved the same subject matter as to which the consultants were retained, paid and consulted by opposing counsel.

[6] *See, e.g.*, *Wyatt By and Through Rawlins v. Hanan*, 871 F.Supp. 415, 420-21 (M.D.Ala.1994) ("lawyers are in the best position to develop[] mechanisms to assure that both they and the expert have a clear and unambiguous understanding that a confidential relationship has been created…. [B]ecause lawyers seeking to invoke the confidential relationship have the knowledge, experience, and the ability to avoid the conflict, it is appropriate that

received payment from Bard for any work in any mesh case. (Kohli Decl., ¶ 16).  Moreover, unlike in *Androgel*, Bard terminated Dr. Kohli's involvement as an expert based on his publication of an article discussing the controversies and problems associated with transvaginal POP mesh kits. (Kohli Decl., ¶ 12). *See*, *Coates v. Duffer's Golf Center, Inc.*, 2007 WL 1289890 at *1 (D.Mass.2007) (fact that "it is clear that plaintiffs' counsel functionally terminated their relationship with [its former expert] Ms. Armstrong when he decided against calling her as an expert at trial, something that happened well before she was contacted by the defendants," weighed against expert's disqualification).  Not only does this fact further refute any contention that Bard had a reasonable expectation of confidentiality, it also undermines Bard's allegation that Dr. Kohli was its "go-to" expert in defense of its mesh products generally.

In addition, unlike the consultant in *Androgel*, Dr. Kohli was a testifying expert in the *Scott* case, and Ms. Daly's declaration states that Bard intended for him to serve as a testifying expert in the *Queen* and *Cisson* MDL cases – at least up until Bard terminated him based on his article.  Dr. Kohli's testimony in *Scott* is a matter of public record.  Given that Bard intended for Dr. Kholi to serve as a testifying expert, any communications between Bard and Dr. Kohli upon which he relied in forming any opinion would be presumptively subject to disclosure and cross-examination, and thus as several courts have recognized in similar situations, Bard had no reasonable expectation of confidentiality in its communications with Dr. Kohli.[7]

---

the consequences for failing to take the necessary precautionary measures should fall upon them."). *Accord*, *Paul v. Rawlings Sporting Goods*, 123 F.R.D. 271, 279 (S.D.Ohio 1988).

[7] *See, e.g.*, *In re Androgel*, *supra* at *3 ("If [former GT defense expert] had testified,…her work would have been discoverable under Federal Rule of Civil Procedure 26."); *Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D.Md.1992) (information discoverable by opponent could not be considered "potentially prejudicial confidential information," and thus disqualification not warranted); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F.Supp. 1498, 1503 (D.Colo.1993) (because opposing party was entitled to discover information relied upon by testifying expert, it would be objectively unreasonable for party to expect that information provided to expert would be kept confidential); *Chrisjulbrian Co. v. Upper St. Rose Fleeting Co., Inc.*, 1994 WL 673440, *2 (E.D.La.1994) ("Mr. Williams was a testifying expert in the Barge CJB–290 litigation. As such, the factual basis upon which he based his

Finally, the same factor that was held to preclude disqualification of either former defense expert in *Androgel* should also be dispositive of Bard's motion here: Bard never provided any confidential information to Dr. Kohli. In its voluminous attorney declarations and exhibits, Bard fails to specify any written documentation that it claims was provided to Dr. Kohli that could be considered "confidential," the disclosure of which would result in prejudice to Bard. *Paul v. Rawlings Sporting Goods*, *supra* at 280 (where expert "appears neither to have made use of, nor to be in possession of, any information which could be classified as a trade secret or deserving of protection on the same type of theory," disqualification not warranted). As set forth above, the only contention in Bard's attorney declarations that Dr. Kohli received any sort of "confidential" information from Bard relate to "defense strategy" and "work product." However, the case law cited below is clear that this sort of vague assertion will not satisfy Bard's burden.

Consistent with the MDL court's holding in *In re Androgel*, numerous courts have recognized that conclusory allegations like those by Bard here do not satisfy the burden of the party seeking disqualification. For example, Magistrate Judge Eifert recognized in the AMS MDL that the party seeking to disqualify an expert "ha[s] the burden of showing that 'specific and unambiguous' disclosures were made to [the expert] that if revealed would prejudice" that party, and "[t]his burden cannot be met with 'generalized and vague allegation that the expert knew 'mental impressions and trial strategies.''" *In re American Medical Systems, Inc. Pelvic*

---

report was discoverable under Fed.R.Civ.P. 26. Thus, CJB and Commercial Union could not have had an 'objectively reasonable' belief in a 'confidential' relationship."); *Stencel v. Fairchild Corp.*, 174 F.Supp.2d 1080, 1084 (C.D.Cal.2001) ("[S]ince the evidence shows that [the Plaintiff] contemplated using [witness] as a testifying expert this undermines Plaintiff's claim of a confidential relationship, since testifying experts must reveal the underlying sources relied upon in reaching their conclusions at deposition and on cross examination."); *Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Amer., Inc.*, 2006 WL 5164249, *4 (C.D.Cal.2006) ("Only the disclosure of confidential information that the opposing party would be unable to obtain through discovery should form a basis for disqualification of an expert witness.").

*Repair Systems Prods. Liab. Litig.*, MDL No. 2325, Pretrial Order #91.[8]  In *Coates v. Duffer's Golf Center, Inc.*, 2007 WL 1289890, *1-*2 (D.Mass.2007), the court observed that where – as here – the movant's unsupported assertions of confidential disclosure are directly refuted by the expert, the moving party has not met its burden, and its motion should be denied. *Accord*, *BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 500 F.Supp.2d 957, 961-62 (N.D.Ill.2007) (expert's disqualification not warranted where movant's "confidential" assertions were vague and conclusory, and were rebutted by the expert).  Bard offers nothing more than vague allegations, none of which are supported by any factual details, and all of which are directly refuted by Dr. Kohli.  Therefore, Bard's motion should be denied.

    Aside from being legally insufficient, Bard's counsel's boilerplate allegations that they shared "defense strategies" with Dr. Kohli are also unfounded.  As his *Scott* deposition and trial testimony confirm, Dr. Kohli's role was to serve as a case-specific causation expert, and to rebut a plaintiff's doctor expert based on his own knowledge and experience.

---

[8] *Quoting* Y*oung v. Southern Cal Transport, Inc.*, 2010 WL 916665, at *6 (S.D.Miss.2010) ("vague discussion does not implicate the application of the attorney work product privilege.") and *In re JDS Uniphase Corp.*, 2006 WL 2845212, at *3 (N.D.Cal.2006) (allowing expert to testify where "[n]one of the information that Lead Plaintiff points to as confidential comes close to constituting attorney work product or falling within the scope of the attorney-client privilege.").  *See also*, *Novartis AG v. Apotex, Inc.*, 2011 WL 691594 (D.N.J.2011) (moving party's failure to identify any specific confidential information shared with former expert warranted denial of motion to disqualify); *Atlantic City Assocs., LLC v. Carter & Burgess Consultants, Inc.*, 2007 WL 63992 at *2 (D.N.J.2007) (finding that the "generalized and vague allegation that the Experts know 'mental impressions and trial strategies, including his views on the strength and weaknesses of the various methods for measuring delays on construction projects and calculating damages in construction disputes'…is hardly the sort of proffer that should compel a court to disqualify an expert.") (*cited* in *In re: Androgel*, *supra* at *4); *Sygenta Seeds, Inc. v. Monsanto Co.*, 2004 WL 2223252 (D.Del.2004) (party's allegation that it shared confidential and proprietary materials with former expert through collaborations and prior litigations failed to "identify specific confidential information defendant gave to [the expert] or explain how this information relates to the present matter."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1995 WL 925673, *6-*7 (E.D.Pa.1995) (medical device product liability MDL; court denied motion to disqualify expert in spite of defendants' claims that expert was previously retained by defense as consultant in same MDL, and that expert "addressed several confidential matters…including the factual and legal issues relating to the regulatory history and status of [defendant's] devices, and [defendant's] possible responses to plaintiffs' arguments…[and] that the parties reviewed documents…relevant to [its] defense," finding that such allegations were not supported by any evidence); *Wyatt By and Through Rawlins v. Hanan*, 871 F.Supp. 415, 421 (M.D.Ala.1994) (disqualification denied where party's "statements that [its former expert in same litigation] received confidential or privileged information" were "at most, only conclusory.").

**B. Dr. Kohli did not develop any expertise based on any information provided to him by Bard's attorneys or any work done under their direction, and he does not intend to offer any opinion based on any litigation-related work done for Bard or information received from Bard's attorneys, and thus Bard's motion should be denied.**

In *Lacroix v. BIC Corp.*, 339 F.Supp.2d 196 (D.Mass.2004), the court denied a motion to disqualify a fire dynamics expert in a product liability case involving the defendant's lighter, even though it was undisputed that the expert had a multi-year litigation consulting relationship with the defendant, and had previously signed a retainer agreement with a confidential non-disclosure agreement.  Although the expert in *Lacroix* was privy to the defendant's confidential information in prior similar litigation involving the defendant's lighters, the court declined to disqualify the expert because he had never received any confidential information specific to the plaintiff's case, and more importantly, the expert "did not develop any expertise in the area of fire safety from work done under [the defendant's] direction or using its funds." *Id.* at 201 (*citing Paul v. Rawlings Sporting Goods*, 123 F.R.D. 271, 280 (S.D.Ohio 1988).

In *Paul*, the court similarly concluded that disqualification of the expert in question was not warranted under facts analogous to those here.  *Paul* involved a product liability action on behalf of a young man who suffered brain damage after being struck in the head by a wild pitch while wearing a Rawlings batting helmet.  The biomechanics expert in *Paul*, Dr. Goldsmith, consulted with Rawlings' attorneys about baseball helmet design and testing, and had also received certain information from Rawlings' counsel specific to the plaintiff's case and the nature of his injuries. 123 F.R.D. at 273-77.  Rawlings' attorney stated that Rawlings considered Dr. Goldsmith to be its expert specifically for purposes of the *Paul* case. *Id.* at 275-76.  Rawlings moved to disqualify the expert when he was later disclosed as an expert for the plaintiff in that case.  The court in *Paul*, *Id.* at 280, made several pertinent observations about the nature of the

expert's communications with Rawlings' counsel, as well as the foundation for his expertise and the bases for his opinions, stating as follows:

> Of the communications specific to the *Michael Paul* case which were disclosed at the hearing, the great majority of them consisted of advice given by Dr. Goldsmith to Mr. Patterson. That advice, in turn, appears to have drawn on Dr. Goldsmith's previous testing of baseball helmets. To the extent that Dr. Goldsmith may now have given the same advice to plaintiffs, there is nothing unfair in permitting him to do so. He did not develop any expertise in the area of testing baseball helmets, nor derive any of those specific ideas, from work done under Rawlings' direction or using its funds. Dr. Goldsmith appears neither to have made use of, nor to be in possession of, any information which could be classified as a trade secret or deserving of protection on the same type of theory.

The same reasoning applies in the present cases, and a similar result is warranted. Here, Dr. Kohli's work with Bard on other mesh lawsuits was based on case-specific records and his own experience and knowledge, not on any confidential information provided to him by Bard's counsel. (Kohli Decl., ¶¶ 3-4, 8, 22). None of Dr. Kohli's expertise could be said to result from any communications with Bard's counsel, and Dr. Kohli did not form any opinions based on any information that Bard's attorneys provided to him. *Id.* Like in *Paul*, Dr. Kohli explains in his Declaration that his interactions with Bard's counsel consisted of Bard's lawyers asking him questions, and him advising Bard's counsel, not the other way around. (Kohli Decl., ¶¶ 4, 8, 22) Based on these facts, the instant motion should be denied.

### C. Bard's reliance on this Court's decision in *Rhodes* is misplaced because *Rhodes* is distinguishable on several grounds.

In its brief, Bard places significant reliance on this Court's decision in *Rhodes v. E.I. DuPont De Nemours and Co.*, 558 F.Supp.2d 660 (S.D.W.Va.2008). Bard's reliance on *Rhodes* is misplaced. In *Rhodes*, the defense expert at issue had previously been retained by and consulted with the plaintiffs in litigation involving the same chemical spill. The facts relating to Dr. Kohli's involvement with Bard is distinguishable from the facts in *Rhodes* on several

substantial grounds: (1) unlike in *Rhodes*, Dr. Kohli was intended to be a testifying expert for

Bard, and as such, nothing that was disclosed to him could be considered confidential; (2) unlike

in *Rhodes*, Dr. Kohli never had any written agreement with Bard, never received any payment

from Bard, and his services were terminated by Bard as the result of an article that Bard

considered contrary to its interests; (3) unlike in *Rhodes*, Dr. Kohli does not intend to offer

opinions that are the same as the case-specific or rebuttal testimony he gave in *Scott*; and (4)

unlike in *Rhodes*, there is no legitimate contention that Dr. Kohli received prejudicial,

confidential information from Bard's attorneys.

    First, unlike the former plaintiff's consultant in *Rhodes*, Dr. Kohli was deposed and he

testified at trial in the *Scott* case, and he was also sought to be utilized as a testifying expert in

MDL cases.  Therefore, as set forth above, any information that Bard's attorneys would have

provided to Dr. Kohli in forming his opinions could not be considered "confidential."[9]

    Second, unlike the plaintiffs' consultant in *Rhodes*, Dr. Kohli never had any written

agreement with Bard relating to litigation and had never billed for any time or work spent on any

Bard case, and he was terminated as an expert and told that he could no longer work on any Bard

cases. (Kohli Decl., ¶¶ 12, 15-16).  In light of Bard's decision to terminate his involvement as an

expert based on an article that was critical of POP mesh kits, Plaintiffs submit it is unreasonable

for Bard to try and prohibit Dr. Kohli from providing such testimony here. *See*, *Coates v.*

*Duffer's Golf Center, Inc.*, *supra* at *1 (party's termination of expert weighed against subsequent

motion to disqualify when expert hired by opposing party).

    Third, the expert at issue in *Rhodes* had previously consulted with the plaintiffs' counsel

regarding the same scientific methodology that she intended to testify about for the defense in

---

[9] *See* cases cited in footnote 7 above holding that information that is discoverable is not the sort of prejudicial, confidential information that will support disqualification of an expert.

litigation involving the same chemical spill.  The Court noted **"[m]ost importantly, the two cases involve the same experts…intending to give opinions regarding the same scientific methodology**." *Id.* at 670 (Emphasis added).  Here, on the other hand, Dr. Kohli's testimony in *Scott* was case-specific and fact-dependent,[10] as was his anticipated testimony in *Queen* and *Jones*, and Dr. Kohli did not derive any ideas or opinions about this litigation or mesh generally based on his work as a litigation expert for Bard, or based on any information received from Bard's lawyers. (Kohli Decl., ¶¶ 3-4, 8, 22).  Thus, unlike in *Rhodes*, there is no legitimate concern that any confidential information gleaned from Bard's counsel would impact or influence his testimony here.

Finally, and most importantly, Bard cannot meet its onerous burden of demonstrating that any prejudicial, confidential information was disclosed to Dr. Kohli.  Upon reviewing the facts regarding the expert's prior consultation with the plaintiffs, and receiving *in camera* testimony, this Court determined in *Rhodes* that the expert received both privileged documents and memoranda from counsel summarizing the case and discussing counsel's thoughts regarding the case's key issues, and also was exposed to the law firm's strategy regarding the scientific risk assessment methodology which it sought to have the expert apply.  Based thereon, the Court concluded that the expert was precluded under both the "bright line" rule discussed in *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246 (E.D.Va.1991), as well as under the two-part test discussed there.  The touchstone for disqualification under either test is whether the expert received confidential information from the party seeking disqualification.[11]  Stated

---

[10] Dr. Kohli also stated in his deposition that he intended to offer opinions regarding "general mesh use," but he explained that his "general mesh use" opinions were based on his experience and knowledge, not based on anything furnished to him by Bard's attorneys. (Dkt. No. 1106-1, pp. 51-53).

[11] The so-called "bright-line" rule from *Wang*, as discussed in *Rhodes* at 664, provides that "in cases in which 'it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation **and had received confidential information from the adverse party pursuant to the earlier retention**,'

otherwise, there is no basis for disqualification under either test discussed in *Rhodes* unless the expert received confidential information.[12]  As discussed above, Dr. Kohli never received any confidential information from Bard. (Kohli Decl., ¶¶ 4, 8, 22).  Therefore, disqualification is not warranted under any test.  Bard's motion should be denied.

D.  **Even if the Court were to conclude that Dr. Kohli obtained confidential information from Bard's attorneys, which he denies, Dr. Kohli should not be precluded from providing specific causation testimony in any individual plaintiff's case, or from offering factual testimony based on his personal knowledge and experience, as such would unnecessarily and unfairly prejudice the Plaintiffs.**

Dr. Kohli states in his Declaration that Bard did not provide him with any confidential information during his work on any mesh lawsuit, and Bard certainly has not satisfied its burden of demonstrating with the requisite specificity and detail that it shared prejudicial confidential information with Dr. Kohli.  Nonetheless, even if the Court were inclined to accept Bard's counsel's vague allegations that Dr. Kohli was privy to Bard's confidential "defense strategy" (which he flatly denies), Plaintiffs submit that should not preclude Dr. Kohli's factual testimony or his opinions regarding specific causation in any given case.  There can be no reasonable contention that Dr. Kohli's specific causation testimony, or his factual testimony, was in any way based upon or influenced by any general defense themes or strategies that Bard's attorneys allege that they revealed to him (which he denies).  Similarly, Bard cannot reasonably suggest that it would be unfairly prejudiced by allowing Dr. Kohli to give specific causation testimony or factual testimony in any case.

---

disqualification is 'clear.'" (Emphasis added). *See also*, *Id.* at 671 ("Under the rule from *Wang Laboratories*, an expert retained by the adverse party in the same litigation **who has received confidential information from the adverse party** should be disqualified.") (Emphasis added).

[12] *See*, *Coates v. Duffer's Golf Center, Inc.*, *supra* at *1 (even where expert was previously retained and paid by the opposing party in the same case, disqualification not warranted where the expert did not receive confidential information from the moving party); *Paul*, *supra* at 279 (expert not disqualified where there was a "lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney client privilege.").

In *Lacroix v. BIC Corp.*, *supra* at 201, the court held that the expert was not subject to disqualification, but that he would be limited from testifying on or utilizing any information that he received from the defendant during his years of affiliation as a litigation expert for the defendant.  In *Space Systems/Loral v. Marin Marietta Corp.*, 1995 WL 686369, *4 (N.D.Cal.1995), the court similarly held that the expert was prohibited from disclosing to the plaintiff or testifying about knowledge obtained during his confidential non-disclosure agreement with the defendant, but he was allowed to provide his expert opinion that was based on his independent research and expertise in his field. *Citing, Wang Laboratories, Inc. v. CFR Associates, Inc.,* 125 F.R.D. 10, 14 (D.Mass.1989) (disqualification of expert not warranted, but expert would be limited to testifying based on information he obtained prior to or subsequent to his employment with the plaintiff).  Here, even though Bard fails to identify any specific confidential information that Dr. Kohli received from Bard's attorneys, Plaintiffs respectfully submit that nothing that was allegedly disclosed to Dr. Kohli should be deemed to prevent his factual testimony or his case-specific causation testimony.

In addition to the existence of a confidential relationship and disclosure of confidential information, courts "must consider whether its decision will be prejudicial or fundamentally unfair to either of the parties….  As part of this consideration, the Court may ask whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert….  Consideration of prejudice is especially appropriate at late stages in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings." *Life Technologies Corp. v. Biosearch Techs., Inc.*, 2012 WL 1604710, *8 (N.D.Cal.2012). Disqualification of Dr. Kohli at this stage would severely and unfairly prejudice the Plaintiffs in this trial selection process, and particularly the several individual Plaintiffs in whose cases Dr.

20

Kohli has offered case-specific causation testimony.  It is exceedingly difficult to find qualified urogynecologist experts with the sort of knowledge and experience as Dr. Kohli.  The trial selection Plaintiffs would be without general causation and liability testimony from one of the country's foremost urogynecologists, who has personal knowledge and experience with Bard and Bard's products that very few in the country possess.  The Plaintiffs in whose cases Dr. Kohli has provided a causation opinion would be without a causation expert, and thus would unnecessarily suffer unfair prejudice.

### Conclusion

Expert disqualification is a drastic remedy that should be granted only sparingly, and it is Bard's burden to demonstrate that disqualification is warranted by a high standard of proof.  Bard should not be allowed to hide the truth by relying on vague assertions and boilerplate arguments.  Bard has failed to satisfy its onerous burden on this motion, and its motion should be denied.  Plaintiffs respectfully request the opportunity to bring Dr. Kohli before the Court for *in camera* examination in order for the Court to inquire about these matters directly.

This 3rd day of November, 2014.

*/s/ Henry G. Garrard, III*
Henry G. Garrard, III
hgg@bbgbalaw.com
Georgia Bar No. 286300
Plaintiffs' Lead Counsel and
Member of Plaintiffs' Steering Committee

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
(706) 354-4000

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the CM/ECF

participants registered to receive service in this MDL.

By:     */s/ Henry G. Garrard, III*
Henry G. Garrard, III
hgg@bbgbalaw.com
Georgia Bar No. 286300
Plaintiffs' Lead Counsel and
Member of Plaintiffs' Steering Committee

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
(706) 354-4000