**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

IN RE:  C. R. BARD, INC.
       PELVIC REPAIR SYSTEMS
       PRODUCT LIABILITY LITIGATION       MDL No. 2187

-----------------------------------------------------------------

THIS DOCUMENT RELATES TO
ALL CIVIL CASES

**PRETRIAL ORDER #150**
(Order Granting C.R. Bard, Inc.'s Motion to Disqualify
Neeraj Kohli, M.D. as an Expert)

      This multidistrict litigation ("MDL") involves surgical mesh products designed, manufactured, marketed, and sold by C. R. Bard, Inc. ("Bard") to treat pelvic organ prolapse and stress urinary incontinence, and is one of seven pelvic mesh MDLs currently pending in this court. The present dispute between the parties involves the identification of Dr. Neeraj Kohli as an expert witness on behalf of Plaintiffs. Dr. Kohli is a urogynecologist practicing in the Boston, Massachusetts area. Bard moves the court to disqualify Dr. Kohli from this litigation on the ground that he had a pre-existing relationship with Bard and is engaging in improper "side-switching." (ECF No. 1106). Plaintiffs have responded in opposition to the motion, (ECF No. 1178), and Bard has filed a reply memorandum. (ECF No. 1213). On November 21, 2014, at the parties' request, the court conducted an evidentiary hearing on the motion. (ECF No. 1237). Having fully considered the issues, and for the reasons that follow, the court **GRANTS** Bard's motion to disqualify Dr. Kohli.

## I.   <u>Relevant Background</u>

Long before he agreed to act as an expert witness in the pelvic mesh litigation, Dr. Kohli was a preceptor for Bard. (ECF No. 1178-1 at 2). In that role, he trained physicians on how to use Bard's pelvic mesh repair kits, including the Avaulta line of products designed to treat pelvic organ prolapse. (*Id.*). Dr. Kohli testified that as a consequence of his preceptor position, he had numerous discussions with Bard's management personnel regarding the development and evolution of pelvic mesh products. (ECF No. 1237 at 19). Accordingly, Dr. Kohli possessed extensive knowledge of Bard's pelvic mesh products, implantation procedures, and instructions for use prior to being retained by Bard's legal counsel. (ECF No. 1178-1 at 2)

On March 31, 2010, Taylor Daly, an attorney spearheading Bard's efforts to retain expert witnesses on the safety and efficacy of its pelvic mesh products, contacted Dr. Kohli by telephone to discuss his interest in becoming an expert witness for Bard in pelvic mesh litigation. (ECF No. 1106-1 at 2; ECF No. 1237 at 58). In follow-up to the telephone conversation, Ms. Daly met in person with Dr. Kohli on May 14, 2010 to interview him as a potential trial witness. (ECF No. 1106-1 at 2-3). During this meeting, they discussed Dr. Kohli's experiences with mesh products, his prior consulting work for Bard, his opinion of Bard and its training programs, the potential scope of Dr. Kohli's expert activity, and his general opinions on various issues related to the mesh litigation. (*Id.*)

On May 25, 2010, Ms. Daly asked Dr. Kohli to act as an expert witness in the case of *Scott v. Kannappan, Bard et al.,* pending in the Superior Court of California, County of Kern, and to provide opinions and testimony on case-specific medical issues, as well as broader issues relating to the history of vaginal mesh, his experience with Bard's

mesh products, the complications associated with mesh products, foreign body reactions, Bard's training programs and warnings, and Dr. Kohli's opinions and analysis of the FDA's public health notices related to vaginal mesh products. (*Id.* at 3-4). Dr. Kohli agreed to serve as an expert for Bard; therefore, Ms. Daly sent Dr. Kohli a retention letter along with various documents for him to review. (*Id.* at 4; ECF No. 1237 at 60). According to Dr. Kohli, he subsequently was provided with the clinical records documenting the plaintiff's care, as well as other documents such as the instructions for use of the Avaulta product implanted in the plaintiff and the educational materials at issue. (ECF No. 1237 at 20). However, Dr. Kohli claimed that he was not given any new or confidential materials in the *Scott* case, nor was he asked to provide opinions based upon new or confidential information supplied by Bard's counsel. Instead, he was asked to give his analysis of the medical facts and his review of the care and treatment rendered by the implanting doctor.  (ECF No. 1178-1 at 2-3).

Over the next three years, Ms. Daly had frequent contact with Dr. Kohli in his role as an expert witness for Bard. (ECF No. 1106-1 at 4-20). In addition to retaining Dr. Kohli to provide opinions and testimony in the *Scott* case, Ms. Daly also specifically retained Dr. Kohli to provide opinions and testimony in other vaginal mesh cases, including *Chaplin v. Bard; Rizzo v. Bard, Poltermann v. Bard; Deemar v. Bard; and Locke v. Bard. (Id.* at 4-7). Ms. Daly recalled working with Dr. Kohli, drafting expert disclosures, vetting potential expert witnesses, and responding to the affidavits and disclosures filed by plaintiffs' expert witnesses, including Dr. Ostergard, an expert urogynecologist identified by plaintiffs in the *Scott* case.  (*Id.* at 5-7). Dr. Kohli, on the other hand, did not remember having detailed discussions with Ms. Daly about some of the issues and had no recollection of communications with Ms. Daly regarding the

*Chaplin, Rizzo*, or *Poltermann* cases. (ECF No. 1178-1 at 4-5).

On January 20, 2011, Ms. Daly sent Dr. Kohli a retention letter pertaining to "C. R. Bard, Inc. Vaginal Mesh Litigation," hiring him as "a general consultant" in the mesh cases. (ECF No. 1106-1 at 7, 27-29). In the letter, Ms. Daly noted that her law firm was national coordinating counsel for Bard in cases filed in various jurisdictions throughout the United States relating to Bard's vaginal mesh products, and her partner, Mr. Richard North, was lead counsel. (*Id.* at *27*). She confirmed Dr. Kohli's hourly billing rate of $500, requested that he forward regular, periodic bills, and agreed to pay the invoices on a timely basis. Ms. Daly explained that the vaginal mesh cases principally involved Bard's Avaulta line of products, but also included other vaginal mesh products such as Align. She stated, "it may be necessary for us to disclose to you legal theories, attorney work product or other privileged, confidential, or proprietary communications or information;" therefore, Ms. Daly advised Dr. Kohli that he was not authorized to disclose any information shared with him by Ms. Daly or members of her law firm. (*Id.*) Ms. Daly also notified Dr. Kohli that the expert consulting agreement could be terminated by either party at any time. Nevertheless, Dr. Kohli was not free to work for any other party in the vaginal mesh litigation in light of his confidentiality obligations to Bard and its counsel. (*Id.* at 28). Ms. Daly asked Dr. Kohli to sign the letter if the terms were acceptable and return the signed original to her. Dr. Kohli never signed or returned the letter. He later testified that he did not recall receiving the letter, although he acknowledged that it was properly addressed to his residence. (ECF No. 1237 at 35).

On February 28, 2011, Ms. Daly met with Dr. Kohli to discuss his opinions in the *Locke* and *Scott* cases, and to review the status of the pelvic (vaginal) mesh MDL and his role as an expert in that litigation. (ECF No. 1106-1 at 8). Ms. Daly again spoke with Dr.

Kohli in April 2011 about his opinions in the *Scott* case, emphasizing that he would have to respond to Dr. Ostergard's testimony regarding mesh shrinkage, deformation complications, infection, physician training, implanting techniques, and literature. (*Id.*) According to Ms. Daly, she shared Bard's defense strategies with Dr. Kohli during this conversation and obtained his assistance in developing and refining the defenses. This conversation was followed by another lengthy conversation on November 15, 2011 regarding the *Scott* case during which Ms. Daly again discussed defense strategies related to the FDA public health notice on vaginal mesh, causation issues related to mesh design versus implant procedures, and potential complications. (*Id.* at 9).

Dr. Kohli was formally identified as an expert witness for Bard in the *Scott* case on January 27, 2012. (*Id.* at 22, 35). His anticipated testimony included warnings, clinical studies related to transvaginal mesh, FDA notices, FDA actions related to transvaginal mesh, how the urogynecological community interprets and utilizes such warnings, as well as the standard of care of urogynecologists, causation, damages, and related medical issues. (ECF No. 1106-1 at 35). Dr. Kohli was scheduled for deposition in the *Scott* case on March 1, 2012. (*Id.* at 12). On February 19, 2012, Ms. Daly prepared an agenda for a deposition preparation meeting with Dr. Kohli, and she met with him the following day. (*Id.* at 11). Also present at the meeting were Mr. North and three other attorneys representing Bard, including Michael Brown, the attorney planning to appear as trial counsel on behalf of Bard. (*Id.*) During this meeting, the strengths and weaknesses of Bard's defense were discussed, as was Dr. Kohli's role with respect to each defense. Ms. Daly explicitly imparted to Dr. Kohli the thoughts of Bard's counsel regarding its defenses on each of the issues listed in the agenda and identified which witnesses were expected to provide supportive testimony. (*Id.* at 11-12).

After two more preparation sessions, Dr. Kohli provided his deposition. He testified that had not yet billed Bard for his work; however, he intended to send an invoice that included all of the hours he had spent on the *Scott* case, which he estimated totaled around 50 hours at $500 per hour. (ECF No. 1106-1 at 50). Apparently, Dr. Kohli never sent Bard a bill for his time, although Ms. Daly repeatedly asked him to do so. (ECF No. 1178-1 at 3; ECF No. 1237 at 60-61). Ms. Daly explained the lack of billing by the fact that Dr. Kohli had just opened a new practice at this time and was very busy getting it started. For that reason, she even offered to assist him in preparing his invoices by sharing her documentation with him. (ECF No. 1237 at 60-61).

When asked at his deposition what opinions he intended to offer at trial, Dr. Kohli stated that his opinions fell into three broad categories: (1) "general mesh use;" (2) opinions based "upon my review of the medical records;" and (3) "my review of the plaintiff expert, Doctor Ostergard's submissions of his expert opinion." (ECF No. 1160 at 51). He further clarified that his opinions regarding general mesh use would include the safety and efficacy of the Avaulta procedure and Bard's education of physicians. (*Id.* at 52-53). After completing his deposition, Dr. Kohli engaged in multiple discussions with counsel for Bard in preparation for the upcoming *Scott* trial. (*Id.* at 12-15).

On July 2, 2012, Mr. Richard North wrote to Dr. Kohli confirming the law firm's interest in retaining Dr. Kohli as an expert consultant on behalf of Bard in the MDL. (ECF No. 1106-1 at 31-32). Mr. North explained that Dr. Kohli could not act as an expert, however, in cases involving his own patients. Accordingly, Mr. North provided a list of plaintiffs that were known to be Dr. Kohli's patients and provided guidance on what Dr. Kohli should do if he was improperly contacted about a patient. Mr. North asked Dr. Kohli to confirm his understanding of the letter by signing and returning it. (*Id.* at 32).

Dr. Kohli did not sign or return this correspondence either. However, in the summer of 2012, Dr. Kohli began providing expert services to Bard in two bellwether cases pending in the MDL, *Queen v. Bard* and *Jones v. Bard*. (*Id.* at 16).

On July 18, 2012, Dr. Kohli testified as an expert witness for Bard in the *Scott* case. (*Id.*) At trial, Dr. Kohli provided opinions on a variety of topics. For example, he opined that polypropylene was the safest style of synthetic mesh being used in the pelvis. (*Id.* at 79). In addition, Dr. Kohli discussed the size of the mesh pores and their relation to infection; the benefits of the arms used in the Avaulta design; and the concept and cause of mesh erosion. (ECF No. 1106-1 at 80, 82-90). Dr. Kohli offered general information regarding Bard's instructions for use and then provided opinion testimony regarding the quality of Bard's instructions for use and its educational offerings to physicians. (*Id.* at 90-100). Dr. Kohli also testified regarding the medical care rendered to the plaintiff, concluding that no defect in the Avaulta product caused plaintiff's injuries. (*Id.* at 113). Finally, Dr. Kohli provided testimony to rebut the opinions of plaintiff's expert, Dr. Ostergard. He disagreed with Dr. Ostergard's views on the safety of vaginal mesh in general, and rejected Dr. Ostergard's opinion that the design of the Avaulta product was unreasonably dangerous because the arms increased the risk of infection. (*Id.* at 122). Furthermore, Dr. Kohli debated Dr. Ostergard's opinion that polypropylene degraded, and Dr. Kohli disagreed with Dr. Ostergard's conclusion that Avaulta was defectively designed in that it placed too much support on the bladder neck resulting in urinary retention. (*Id.* at 131-32). Accordingly, Dr. Kohli was prepared to provide, and indeed provided, opinions on issues common to all of the pelvic mesh cases against Bard, not simply issues specific to the *Scott* litigation. Despite the broad subject matter of his testimony, Dr. Kohli insisted that he never discussed

7

Bard's theories of defense with its trial counsel. (ECF No. 1178-1 at 8).

After the *Scott* trial, Dr. Kohli began working in earnest on cases pending in the MDL. (ECF No. 1106-1 at 16-17). Dr. Kohli was asked to review documents, prepare expert reports, and critique the opinions of plaintiffs' experts. According to Ms. Daly, in January 2013, she had in-depth conversations with Dr. Kohli regarding specific experts identified by plaintiffs during which they discussed Bard's defense strategy in responding to the experts' opinions. (*Id.* at 18). In particular, she recalled providing Dr. Kohli with a confidential Excel spreadsheet that she had prepared. The spreadsheet took data from the FDA's Maude database and arranged it to show a comparison of adverse events reported by different mesh manufacturers. Ms. Daly thought the spreadsheet could support an argument that Bard's Avaulta products were safe and hoped for Dr. Kohli's input as she developed the strategy. (ECF No. 1237 at 68). Ms. Daly also recalled providing Dr. Kohli with a format to follow when preparing his expert reports in the *Queen* and *Jones* cases.

In contrast, although Dr. Kohli agreed that he spoke with Ms. Daly in some detail about the *Queen* case, he denied that their conversations involved strategy or defense themes. Dr. Kohli also maintained that the Excel spreadsheet was nothing more than a compilation of information available to the public on an FDA database, not something confidential or privileged. (*Id.* at 53). According to Dr. Kohli, his conversations with Ms. Daly were always related to the medical care rendered to Ms. Queen and usually consisted of him answering questions, rather than Bard's counsel sharing defense strategy or mental impressions. (ECF No. 1178-1 at 5). As for the report format prepared and provided by Ms. Daly, Dr. Kohli described it as a "generic form" that was void of new or unique information.

In early February 2013, Ms. Daly began to communicate almost daily with Dr. Kohli about the substance of his reports, including the general topics Bard wanted him to address, the particular opinions offered by plaintiffs' experts that Bard wanted him to rebut, and the medical literature that Bard wanted him to review for comment. (ECF No. 1106-1 at 19). These communications ended abruptly on February 7, 2013 when Bard's trial counsel made a decision not to use Dr. Kohli as an expert in the *Queen* and *Jones* cases. (*Id.* at 19). After being informed of the decision, Ms. Daly immediately e-mailed and subsequently called Dr. Kohli to make him aware and to advise him that he no longer needed to prepare the expert reports. Dr. Kohli testified that Bard's counsel made the decision to terminate his services in response to an article he had written in the October 2012 edition of Current Opinions in Obstetrics and Gynecology, entitled "Controversies in Utilization of Transvaginal Mesh," the substance of which reportedly displeased counsel. (ECF No. 1178-1 at 6). Ms. Daly apologized for the decision, but explained that it was not hers to make. (*Id.*). Ms. Daly asked Dr. Kohli if he would consider working with Bard as a non-testifying, consulting expert. (*Id.;* ECF No. 1106-1 at 19-20). However, after that conversation, Ms. Daly only spoke with Dr. Kohli a few additional times, with the final communication occurring in July 2013. (*Id.*)

In October 2013, Dr. Kohli was contacted by Henry Garrard, counsel for plaintiffs in the MDL, who asked Dr. Kohli if he would agree to a meeting. (ECF No. 1178-1 at 9). Prior to the meeting, Mr. Garrard asked Dr. Kohli if he had a consulting agreement with Bard or any conflict of interest. (*Id.*; ECF No. 1237 at 28). Given the apparent termination of communications with Ms. Daly, Dr. Kohli responded in the negative. (*Id.*). Consequently, Mr. Garrard came to Boston and met with Dr. Kohli. At that time, they engaged in a very general discussion about pelvic mesh and Dr. Kohli's experience

using mesh. (ECF No. 1237 at 28).

Dr. Kohli did not hear from Mr. Garrard again until the summer of 2014. (ECF No. 1178-1 at 9). Mr. Garrard and his partner, Jim Matthews, met with Dr. Kohli on August 28, 2014 to determine if he would be interested in acting as an expert witness for plaintiffs in the pelvic mesh MDL.  After Dr. Kohli signed a Confidentiality Agreement, they showed him some documents that Bard had produced during discovery in the MDL, including a Material Safety Data Sheet and internal communications, which Dr. Kohli had never seen before. After reviewing these documents, Dr. Kohli agreed to become involved in the MDL as an expert witness on behalf of the plaintiffs. (*Id.*)

On October 9, 2014, Plaintiffs filed a designation and disclosure of general expert witnesses applicable to all 200 Wave 1 and Wave 2 cases. (ECF No. 1106-1 at 212-222). Included in this designation and disclosure was Dr. Neeraj Kohli. (*Id.* at 217). In addition, Plaintiffs filed a detailed Rule 26 expert report prepared by Dr. Kohli in three specific MDL cases, although the report was noted also to be applicable to all Wave 1 and Wave 2 cases. (Id. at 224-285). The expert report contained a variety of opinions, including opinions that Bard failed to adequately warn physicians and patients of the risks related to the Avaulta Plus and Avaulta Solo products; that the Avaulta line of products contained design defects; that Bard's physician educational offerings were inadequate; opinions regarding general causation; and opinions relating to the medical care and condition of the three specific plaintiffs. (*Id.*)

Upon receiving the designation and disclosure, Bard's counsel contacted Mr. Garrard and asked him to withdraw Dr. Kohli as an expert witness given his prior and ongoing relationship with Bard as an expert witness in the pelvic mesh litigation. (ECF No. 1106-1 at 287). Although Mr. Garrard knew that Dr. Kohli had appeared as an expert

witness for Bard at the *Scott* trial, he refused to withdraw Dr. Kohli on the basis that Dr. Kohli had been terminated as an expert witness by Bard. Therefore, Plaintiffs were free to retain him. (*Id.* at 288). Consequently, Bard filed the instant motion to disqualify Dr. Kohli.

## II.   **Positions of the Parties**

Bard argues that it retained Dr. Kohli as an expert witness in pelvic mesh repair litigation in March 2010. Since that time, Dr. Kohli has testified on behalf of Bard in the *Scott* case, which remains on appeal, and has consulted in several other pelvic mesh cases, including bellwether cases in this MDL. Incidental to Dr. Kohli's role as an expert witness for Bard, he has had numerous contacts with Bard's counsel and received confidential information regarding their mental impressions and legal strategies related to the pelvic mesh litigation. As a result, Dr. Kohli stood in a confidential relationship with Bard prior to being retained as an expert witness by Plaintiffs and should not be permitted to switch sides in this litigation.

Plaintiffs concede that Dr. Kohli was retained by Bard to provide expert witness opinions in pelvic mesh cases. Nonetheless, they argue that Dr. Kohli's past relationship with Bard's counsel does not preclude him from acting as their expert witness now, because (1) his prior opinions were limited to case specific medical opinions; (2) he received no confidential information during his relationship with Bard's counsel; and (3) Bard terminated his services. Plaintiffs further assert that Dr. Kohli never had a written agreement with Bard and never billed Bard for his services. Moreover, they contend that to the extent Dr. Kohli learned anything confidential regarding Bard's trial strategy, once Dr. Kohli testified in the *Scott* case, nothing disclosed to him by Bard's counsel can be considered confidential any longer. Plaintiffs submit that it is

unreasonable for Bard to prohibit Dr. Kohli from testifying in all pelvic mesh cases simply because he provided fact-specific opinions in a handful of cases for Bard.

## III.  <u>Discussion</u>

"A federal court has the inherent power to disqualify experts." *Rhodes v. E. I. DuPont de Nemours Co.,* 558 F.Supp.2d 660, 664 (S.D.W.Va. 2008) (citing *Grant Thornton, LLP v. FDIC,* 297 F.Supp.2d 880, 882 (S.D.W.Va. 2004)). "This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process." *Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F.Supp 1246, 1248 (E.D.Va. 1991). However, disqualification is a drastic remedy that courts should use sparingly. *Hewlett-Packard Co. v. EMC Corp.,* 330 F.Supp.2d 1087, 1092 (N.D.Cal. 2004) (citations omitted). The burden of showing that disqualification is warranted rests with the party seeking disqualification and requires a "high standard of proof." *Rhodes,* 558 F.Supp.2d at 664 (quoting *Tessier v. Plastic Surgery Specialists, Inc.* 731 F.Supp. 724, 729 (E.D.Va. 1990)).

This court recognizes two distinct standards for disqualifying expert witnesses for conflicts of interest; the bright-line rule and the two-part test. *Rhodes,* 558 F.Supp.2d at 666. Under the bright-line rule, when it is undisputed that an expert, who was previously retained by the adverse party in the same litigation and received confidential information as part of that earlier retention, is now blatantly side-switching, disqualification is clear. *Id.* at 664 (citing *Wang Labs.*, 762 F.Supp. at 1248). On the other hand, when it is not quite so obvious or undisputed that side-switching is occurring, the two-part test is applied. Under the two-part test, the court must answer two fundamental questions to determine whether an expert's prior relationship with an

adverse party justifies the expert's disqualification. *Id.* at 667. First, did the moving party have an objectively reasonable expectation of a confidential relationship with the expert? To answer this question, the court should consider whether: (1) the relationship between the expert and the adverse party was long-standing and involved frequent contacts; (2) the adverse party directed or funded the formation of an opinion by the expert; (3) the expert and adverse party entered into a formal confidentiality agreement; (4) the expert was retained by the adverse party for the purpose of assisting in the litigation; (5) a fee was paid to the expert by the adverse party; and (6) the expert derived specific ideas about the litigation from work done under the direction of the adverse party. *Id.*; *see also Syngenta Seeds, Inc. v. Monsanto Co.,* No. 02-cv-1331, 2004 WL 2223252, at *2 (D.Del. Sept. 24, 2004). Second, did the adverse party disclose to the expert confidential information that is sufficiently related to the instant litigation to merit disqualification? In this context, confidential information is "information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege,'" including such things as litigation strategy, strengths and weaknesses of the case, the role of experts at trial, and anticipated defenses. *Rhodes,* 558 F.Supp.2d at 667 (quoting *Hewlett-Packard Co.,* 330 F.Supp.2d at 1094). When both queries are answered in the affirmative, the expert usually should be disqualified. Otherwise, disqualification is generally inappropriate. Before making a final decision, the court should also take into account the principle of basic fairness, as well as competing policy considerations. "The policy objectives in favor of disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity. The policy objectives weighing against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging

13

experts to pursue their professions." *Novartis AG v. Apotex Inc.,* No. 09-5614, 2011 WL 691594, at *1 (D.N.J. Jan. 24, 2011); *also Rhodes,* 558 F.Supp.2d at 667-68 (quoting *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994)). The availability of other experts and the burdens on the nonmoving party associated with retaining a new expert should also be considered. *Rhodes,* 558 F.Supp.2d at 668.

### A.   <u>The Bright-Line Rule</u>

In their written opposition, plaintiffs claim that Bard cannot establish a confidential relationship with Dr. Kohli. In support of their position, plaintiffs argue that Dr. Kohli never signed or returned any of the retention letters sent to him by Bard's counsel, never invoiced Bard, and was never paid for his expert services. They also allege that Bard never shared any confidential information with Dr. Kohli. Indeed, they assert that everything Dr. Kohli received from Bard's counsel, other than medical records, were documents he had already seen in his role as a preceptor for Bard.

At the evidentiary hearing, plaintiffs changed course slightly and conceded that Dr. Kohli was retained by Bard to act as an expert witness in some of the pelvic mesh cases. However, they continue to argue that the bright-line rule does not apply to Dr. Kohli. Plaintiffs claim that the bright-line rule is inapplicable first and foremost for the simple reason that Bard did not retain Dr. Kohli as an expert in the same litigation for which plaintiffs now propose to use him. Moreover, plaintiffs persist in their contention that no confidential information was provided to Dr. Kohli.

In *Rhodes*, the court found that the defendant's expert witness, Dr. Elizabeth Anderson, merited disqualification under the bright-line rule. The *Rhodes* case involved the alleged contamination of drinking water from the release of perfluoroctanic acid ("C-8") from the defendant's plant in Wood County, West Virginia. A class action was filed

against the defendant in West Virginia state court, styled *Leach v. E. I. du Pont de Nemours & Co.*, on behalf of certain persons from communities where the water was allegedly contaminated. In order to be a part of the class, a plaintiff's water had to contain a designated threshold amount of C-8 when tested. Plaintiffs' counsel in the *Leach* action retained Dr. Anderson in 2001 to provide expert services in connection with the class action. After being retained, Dr. Anderson was provided documents and had telephone conversations with plaintiffs' counsel "during which highly confidential issues of case strategy and expert testimony in support of that strategy were discussed." *Rhodes,* 558 F.Supp.2d at 663. After reviewing literature, Dr. Anderson apparently advised plaintiffs' counsel that she would not testify on behalf of plaintiffs. Despite Dr. Anderson's position, her firm, Sciences International, continued to work with plaintiffs' counsel for several years, although most of the work was performed by Dr. David Gray, a colleague of Dr. Anderson.

Five years later, in 2006, the *Rhodes* case was pending in the United States District Court for the Southern District of West Virginia. This action was comprised of plaintiffs who were originally among the *Leach* plaintiffs, but had been excluded from the class for not meeting the requisite threshold level of C-8. The plaintiffs' water subsequently met the threshold on re-testing; therefore, they sued in a separate action, alleging contamination of their drinking water by the defendant's release of C-8 from its Wood County plant. Defendant filed an expert disclosure in the *Rhodes* litigation, identifying Dr. Anderson as a class certification expert who would opine that plaintiffs had improperly used regulatory risk assessment principles to draw inferences of class-wide risk for serious latent diseases. Plaintiffs moved to disqualify Dr. Anderson based upon her prior relationship with plaintiffs' counsel in the *Leach* case. At a hearing on the

motion, plaintiffs' counsel testified *in camera* that in order to obtain Dr. Anderson's opinion, he had selected documents to provide to Dr. Anderson from a large pool of available information and prepared a confidential memorandum that he gave to her which included his views on key issues in the case and his legal strategies. In contrast, Dr. Anderson refuted that she received confidential information from plaintiffs' counsel.

In analyzing the motion, the court pointed out that while the two cases were separate litigations, they were "so intertwined with respect to their use of experts that for the purpose of expert disqualification, they functionally constitute the same case." *Id.* at 670. The cases involved the same defendant, the same chemical, the same alleged tortious behavior, and plaintiffs allegedly harmed due to the same activity. Furthermore, the cases shared the same central scientific issue of whether C-8 was toxic to humans. Also of great significance to the court, the cases involved the same experts giving opinions about the same scientific methodology. Although Dr. Anderson claimed that she did not agree with the methodology, and that is what prompted her to tell plaintiffs' counsel that she would not testify for them in the *Leach* case, she gained information regarding counsel's strategy as part of her involvement with him. Accordingly, because the cases were functionally the same, Dr. Anderson was considered to be an expert retained by the adverse party, who was given confidential information, and was subject to disqualification under the bright-line rule. *Id.* at 670-71.

Applying the reasoning of the *Rhodes* court to the facts here, the undersigned **FINDS** that Dr. Kohli should be disqualified as an expert witness under the bright-line rule. First, the pelvic mesh cases that Dr. Kohli agreed to work on with Bard are functionally the same as the Wave 1 and Wave 2 cases. These cases involve the same defendant, the same product lines, the same polypropylene mesh, the same alleged

tortious behavior and product liability claims, the same underlying medical conditions, the same basic documents, the same scientific and medical issues, and the same alleged harm. Most of the cases involve the same group of expert witnesses, or similar experts. Thus, plaintiffs' claim that they have retained Dr. Kohli for different litigation is entirely without merit.

Similarly, plaintiffs' suggestion that Dr. Kohli already had all of Bard's confidential information ignores the thrust of the *Rhodes* case. Confidential information includes attorney work product, mental impressions, defense strategies and planning, not just "top secret" documents in the hands of the client. Although Dr. Kohli insists that he did not receive confidential information during his nearly four-year relationship with Bard's counsel, his testimony is implausible. According to the testimony of Ms. Daly, one of Bard's lawyer, Dr. Kohli participated in many discussions that required the disclosure of attorney work product in the form of mental impressions and defense strategy. For example, she discussed their decisions regarding whether to allocate fault against treating physicians and whether to raise hospital credentialing as a defense. Ms. Daly vetted potential expert witnesses with Dr. Kohli and discussed strategies on how to cross-examine plaintiffs' experts, including Dr. Ostergard, who is now named as a co-expert witness for plaintiffs in the Wave 1 and Wave 2 cases. Ms. Daly and her colleagues prepared Dr. Kohli on how to address particular concerns with Bard's instructions for use and physician education in order to testify in the *Scott* trial. (ECF No. 1106-1 at 65-67). Now in the Wave 1 and Wave 2 cases, Dr. Kohli has been identified by plaintiffs as an expert witness to provide opinions on the inadequacies of Bard's instructions for use and physician education. (*Id.* at 225-284). Ms. Daly testified about preparing an Excel spreadsheet regarding the adverse events associated with Bard's

mesh compared to mesh products marketed by other manufacturers, which she shared with Dr. Kohli, to determine if it could be used to support arguments on the safety of the Avaulta product line. Dr. Kohli is now being offered to testify that Avaulta is defective in design and that other designs are safer. Although the Excel spreadsheet used information obtained from an FDA database that is available to the public, "the material was put together and interpreted in [the] chart" by counsel for Bard. (ECF No. 1237 at 81). Therefore, the document itself was attorney work product shared with Dr. Kohli. Even if the value of the information shared with Dr. Kohli is debatable, its essential nature as work product is not. *Wang Labs,* 762 F.Supp. at 1249. ("No experienced litigator would freely disclose these [types of] materials to opposing counsel.")

Ms. Daly documented more than seventy-five (75) substantive contacts with Dr. Kohli during their working relationship, including face-to-face meetings. As of the date of his deposition in the *Scott* case, which occurred approximately two years after he was first retained to assist Bard as an expert witness, Dr. Kohli testified that he had spent approximately 50 hours working on the *Scott* case alone. (ECF No. 1106-1 at 50). Undoubtedly, Dr. Kohli had a close working relationship with Bard's counsel, and in the course of that relationship received confidential information such as litigation strategy, mental impressions regarding the strengths and weaknesses of the pelvic mesh cases, the role of experts at trial, and Bard's anticipated defenses. Even Dr. Kohli admitted on cross-examination that he understood his communications with Bard's counsel were confidential, and for that reason, he has not disclosed them. (ECF No. 1237 at 37).

In summary, Dr. Kohli was retained as an expert by Bard in the same litigation, received confidential information secondary to that retention, and now seeks to blatantly side-switch. Accordingly, he should be disqualified under the bright-line rule.

### B.     The Two-Part Test

Although Dr. Kohli's disqualification under the bright-line rule renders an analysis under the two-part test unnecessary, the undersigned **FINDS** that Dr. Kohli should also be disqualified under the two-part test. Taking each of the relevant inquiries in turn, both must be answered in the affirmative. Furthermore, when weighing the policy considerations, disqualification is the proper course.

#### 1.     Did Bard have an objectively reasonable expectation of a confidential relationship with Dr. Kohli?

Plaintiffs concede that Bard had an objectively reasonable expectation of a confidential relationship with Dr. Kohli. Not only did the relationship between Bard's counsel and Dr. Kohli last nearly four years, it also involved frequent contacts. According to the record, Dr. Kohli engaged in multiple face-to-face meetings with counsel, appeared for deposition testimony, testified at one trial, exchanged numerous e-mails, and had lengthy telephone conversations. In fact, the relationship had not clearly been terminated at the time Dr. Kohli began communicating with plaintiffs' counsel. Certainly while Bard's counsel had expressed their intention not to designate Dr. Kohli as a trial expert in any future cases, the record suggests their intention to continue a consulting relationship with him. Dr. Kohli, however, considered the relationship to be over.

During the four years that Dr. Kohli provided expert services to Bard in pelvic mesh cases, it is undisputed that he provided formal opinions on various aspects of the litigation. It is also undisputed that Dr. Kohli undertook to provide these opinions in exchange for payment of an hourly rate of $500, and he was expected to send a bill on a periodic basis to Bard's counsel setting forth his hours and expenses. Apparently Dr.

Kohli never invoiced his time and was never paid. However, he could still issue an invoice for the time he spent working on the cases for Bard's counsel given that Bard clearly intended to pay Dr. Kohli for his expert services.

Although Dr. Kohli claims that he never received a retention letter from Bard's counsel and never signed any written agreement with them, the record demonstrates that counsel sent Dr. Kohli at least two such letters. The letters confirmed Dr. Kohli's agreement to act as an expert, his hourly rate, his duty to send invoices periodically, his obligation to keep information confidential, and his restriction from working for other parties to the litigation. Dr. Kohli conceded that the retention letters were properly addressed, and even though they were not signed, Dr. Kohli began to provide expert services in keeping with the retention letters.

The evidence before the court suggests that Dr. Kohli developed specific ideas regarding the litigation as a result of work he performed for Bard. As indicated, Dr. Kohli was provided with the reports prepared by plaintiffs' experts and asked to assist in the development of cross-examination strategies and rebuttal reports. He was given specific medical literature to read and potential exhibits to review. He was asked to prepare expert reports to support the reasonableness of Bard's instructions for use and professional education. In addition, he was given medical records and developed theories of causation, as well as worked with counsel on strategy related to the role of the treating physician in the outcome.

### 2.  Did Bard disclose to Dr. Kohli confidential information that is sufficiently related to the instant litigation to merit disqualification?

Both Plaintiffs and Dr. Kohli maintain that Bard never disclosed confidential information to Dr. Kohli during the consulting relationship. Plaintiffs argue that Bard

has the burden of showing that "specific and unambiguous" disclosures were made to Dr. Kohli that if revealed would prejudice Bard, *Surfcast, Inc. v. Microsoft Corporation,* No. 2:12-cv-333-JAW, 2013 WL 5435693, at *4 (D.Me. Sept. 30, 2013), and this burden cannot be satisfied with a "generalized and vague allegation that the expert knew 'mental impressions and trial strategies.'" *Novartis AG,* 2011 WL 691594, at *4. Plaintiffs emphasize that Dr. Kohli was already familiar with most of Bard's business documents relating to its pelvic mesh products from having acting as a preceptor, and whatever Dr. Kohli learned about trial strategy was disclosed when he testified in the *Scott* litigation. Dr. Kohli adds that he primarily provided opinions regarding the medical care and treatment of the plaintiffs. Therefore, rather than receiving confidential information from Bard relevant to pelvic mesh litigation in general, he shared his thoughts and impressions about specific patient-related issues.

The undersigned disagrees for several reasons. First, although Dr. Kohli had some familiarity with Bard's instructions for use and physician education, it is clear from the testimony of Ms. Daly and from Dr. Kohli's deposition and trial testimony in the *Scott* case that Bard's counsel made strategic decisions about what documents to have Dr. Kohli review and what topics to have him address as an expert witness, and had multiple discussions with him on how best to present his opinions and rebut the opinions of the adverse experts. Whether or not Dr. Kohli appreciates it, this type of discussion and decision-making constitutes attorney work product generally not subject to discovery. Fed. R. Civ. P. 26(b); *see also Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 581 (D.N.J. 1984) (holding that the selection and grouping of documents to send to an expert witness may represent the mental impressions of counsel and therefore be protected work product). Moreover, Dr. Kohli did more than just offer opinions on

21

specific patient-related medical issues. Indeed, he testified regarding the safety of polypropylene; the risk of infection caused by small pore size in mesh; the reason for arms in the Avaulta design; mesh erosion; the adequacy of Bard's instructions for use and its physician training; and hospital credentialing. (ECF No. 1106-1 at 79-100, 115-118). Dr. Kohli also explicitly rebutted opinions expressed by Dr. Ostergard, plaintiffs' expert witness, on the safety and efficacy of the Avaulta product. (*Id.* at 121-135).

Second, Dr. Kohli concedes that Bard's counsel contacted him on several occasions to talk about individuals they were considering as potential expert witnesses. The selection of expert witnesses is one of the most crucial steps in product liability litigation. Through his contacts with Bard's counsel, Dr. Kohli gained insight into counsel's vetting process. In addition, Dr. Kohli admitted having discussions with counsel about the experts disclosed by plaintiffs. The weaknesses and strengths of the experts' opinions were reviewed, and Dr. Kohli provided suggestions on avenues of cross-examination. Again, through these communications, Dr. Kohli gained insight into counsel's mental impressions of the experts, some of whom are still appearing in the pelvic mesh litigation on behalf of plaintiffs, and into areas that counsel found most concerning about the opinions.

Finally, when considering the length of time that Dr. Kohli served as an expert for Bard, the number of contacts he had with counsel as documented by Ms. Daly, the nature and extent of his testimony in the Scott case, the expansion of his expert services over time from the *Scott* case to the MDL and other cases, and Ms. Daly's statements under oath regarding the medical literature, Excel spreadsheet, and other documents she selected for Dr. Kohli's review, Dr. Kohli's belief that he received **no** confidential information is simply mistaken. Weighing the reliability of the testimony, the

22

undersigned finds that even if Bard did not provide Dr. Kohli with one single written document labeled confidential, Bard's counsel plainly shared mental impressions and litigation strategy that can readily be identified as attorney work product, falling within the definition of confidential information for the purposes of the answering the second question of the two-part test.

### 3. *Additional Policy Considerations*

In addition to answering both questions in the affirmative, the undersigned **FINDS** that policy considerations weigh in favor of Dr. Kohli's disqualification. The court is tasked with preserving the integrity of the judicial process while considering fundamental fairness to the parties. Other concerns are whether the opposing party will be unduly burdened by having to retain a new expert witness and whether other experts are available.

Plaintiffs argue that they will be greatly prejudiced if Dr. Kohli is disqualified. They claim that he has reviewed records in sixteen individual cases, some of which are in the next trial group. However, this argument is unpersuasive given that plaintiffs' counsel was fully aware that Dr. Kohli's was Bard's expert witness in the *Scott* case. Counsel's paralegal sat through the trial and obtained a transcript of Dr. Kohli's trial testimony. Thus, plaintiffs' counsel was likewise fully aware that Dr. Kohli had provided broad-based opinions that were, at a minimum, applicable to all pelvic mesh cases involving the Avaulta line of products. Plaintiffs' counsel could easily have avoided their current predicament by notifying Bard's counsel of plaintiffs' intent to retain Dr. Kohli as an expert witness. Consequently, the issue could have been addressed and resolved before any time or money was invested in Dr. Kohli. Furthermore, plaintiffs have identified multiple other urogynecologists as experts in the Wave 1 and Wave 2 cases.

Accordingly, they have ready access to experts with credentials similar to those possessed by Dr. Kohli that can review the records of his sixteen cases and replace him. Alternatively, allowing Dr. Kohli to change course in mid-stream would offend the notion of fundamental fairness and set a dangerous precedent in mass tort litigation.

**IV.**   **Conclusion**

Wherefore, for the reasons stated in this order, the court **GRANTS** Bard's motion to disqualify Dr. Kohli. (ECF No. 1106).

The court **DIRECTS** the Clerk to file a copy of this order in 2:10-md-2187 and it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:14-cv-29450. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at **http://www.wvsd.uscourts.gov**.

**ENTERED:** December 8, 2014

Cheryl A. Eifert
United States Magistrate Judge