IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

IN RE: C. R. BARD, INC.,
    PELVIC REPAIR SYSTEM
    PRODUCTS LIABILITY LITIGATION          MDL No. 2187

---

THIS DOCUMENT RELATES TO C. R. BARD WAVE 4 & WAVE 5 CASES
BEFORE JUDGE GOODWIN:

MEMORANDUM OPINION AND ORDER
(*Daubert* Motion re: Robert Babkowski, M.D.)

The plaintiffs filed their Notice of Adoption of Prior Daubert Motion of Robert Babkowski, M.D. for Waves 4 and 5 cases ("Notice") [ECF No. 4539] in *In re C. R. Bard, Inc.*, *2:10-md-2187*, MDL 2187, on September 27, 2017. The plaintiffs attached as exhibits to their Notice a motion [ECF No. 4539-1], memorandum in support [ECF No. 4539-2], and reply brief [ECF 4539-3], which plaintiffs seek to adopt and incorporate as their briefing for Waves 4 and 5. Defendants also adopted and incorporated by Notice of Adoption of C.R. Bard, Inc.'s Prior Response in Opposition to Plaintiffs' Motion to Exclude or Limit the Opinions of Robert Babkowski, M.D. for Wave 4 and Wave 5 cases, a brief in response to Plaintiffs' Motion. [ECF No. 4637]. The court construes the plaintiffs' Notice as a motion. As such, the Notice is now ripe for consideration because the briefing is complete. As set forth below, the plaintiffs' motion is **GRANTED in part**, **RESERVED in-part** and **DENIED in part**.

## I. Background

This case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are more than 16,000 cases currently pending, approximately 1,500 of which are in the Bard MDL, 2187 MDL.

In this MDL, the court's tasks include "resolv[ing] pretrial issues in a timely and expeditious manner" and "resolv[ing] important evidentiary disputes." Barbara J. Rothstein & Catherine R. Borden, Fed. Judicial Ctr., *Managing Multidistrict Litigation in Products Liability Cases* 3 (2011). In an effort to manage the massive Bard MDL efficiently and effectively, the court decided to conduct pretrial discovery and motions practice on an individualized basis. To this end, I selected certain cases to become part of a "wave" of cases to be prepared for trial and, if necessary, remanded.

Upon the creation of a wave, a docket control order subjects each case in the wave to the same scheduling deadlines, rules regarding motion practice, and limitations on discovery. *See, e.g.*, Pretrial Order ("PTO") # 236 (establishing Wave 4); PTO # 244 (establishing Wave 5). To handle motions to exclude or to limit expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the court developed a specific procedure for cases designated in Wave 4 and Wave 5. The court instructed the parties to file briefing on general causation issues in the main MDL, MDL 2187, while specific causation *Daubert* motions, responses,

and replies were to be filed in the individual member cases. To the extent that an expert is both a general and specific causation expert, the court advised the parties that they could file a general causation motion in the main MDL and a specific causation motion in an individual member case. *See* PTO # 236, at 4; PTO # 244, at 4.

Before plunging into the heart of the motion, and to clarify the record, I am compelled to comment on the manner in which the parties filed the instant *Daubert* motion and response in opposition. Similar to other *Dauberts* filed in the main MDL, the plaintiffs filed the instant motion as a "Notice," adopting and incorporating the entirety of a motion and its corresponding papers filed in a previous case before the court. Defendant C. R. Bard, Inc. ("Bard"), likewise, filed its opposing briefs in conjunction with a similar "Notice." The parties then attached the substance of their briefs, i.e., the supporting or opposing memorandum of law, as an exhibit to their respective Notice. So, for example, the plaintiffs attach the memorandum in support of their *Daubert* motion as "Exhibit 1" to their Notice. The plaintiffs also integrate into Exhibit 1 vital supporting papers, such as the expert report and deposition transcripts demarcated rather confusingly within Exhibit 1 as "Exhibit 1" and "Exhibit 2" respectfully, forming one large document. With this in mind, the court turns its attention to the present dispute.

## II. Legal Standard

Under Federal Rule of Evidence 702, expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue" and

(1) is "based upon sufficient facts or data" and (2) is "the product of reliable principles and methods" which (3) has been reliably applied "to the facts of the case." Fed. R. Evid. 702. A two-part test governs the admissibility of expert testimony. The evidence is admitted if it "rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). The proponent of expert testimony does not have the burden to "prove" anything. However, he or she must "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).

The district court is the gatekeeper. It is an important role: "[E]xpert witnesses have the potential to be both powerful and quite misleading"; the court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 588, 595; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)). I "need not determine that the proffered expert testimony is irrefutable or certainly correct" – "[a]s with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (alteration in original) (quoting *Daubert*, 509 U.S. at 596 (alteration in original)); *see also Md. Cas. Co.*, 137 F.3d at 783 ("All *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable . . . and helpful.").

*Daubert* mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593-94).

Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594-95); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("We agree with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" (citation omitted)); *see also Crisp*, 324 F.3d at 266 (noting "that testing of reliability should be flexible and that *Daubert*'s five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, *Daubert* also explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . Rule 702's "helpfulness"

5

> standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert*, 509 U.S. at 591-92 (citations and internal quotation marks omitted). At bottom, the court has broad discretion to determine whether expert testimony should be admitted or excluded. *Cooper*, 259 F.3d at 200.

III. Discussion

Bard offers Dr. Babkowski to testify as an expert witness on the general pathology issues related to the Avaulta products and the Align products sold by Bard subject of this pending litigation. *See* Notice of Adoption of Prior Daubert Mot. of Robert Babkowski, M.D. for Waves 4 & 5, Ex. 1 ("Dr. Babkowski's Expert Report"), at 3 [ECF No. 4539-1]. Among other things, Dr. Babkowski is a board-certified pathologist and the Chair of Pathology and Laboratory Medical Director of Stamford Hospital Health System in Stamford, Connecticut. *Id.* at 2. Dr. Babkowski has more than twenty-five years' experience evaluating human tissue response to neoplastic conditions, he maintains a subspecialty in gynecologic pathology, and he currently teaches pathology to hospital residents and to rotating medical students. *Id.* On a daily basis, Dr. Babkowski receives and analyzes human tissues from consulting physicians and provides diagnostic microscopic evaluations to their patients. *Id.* at 3.

The plaintiffs moved to preclude Dr. Babkowski from offering expert opinions on five matters: (1) the design and physical properties of pelvic mesh products; (2) purported tissue or mesh contraction; (3) specific causation and case specific issues; (4) the adequacy of the Instructions for Use ("IFU"); (5) the Material Safety Data

Sheet ("MSDS") for the Marlex Polypropylene used in the manufacture of the mesh devices; (6) FDA clearance procedures; and (7) medical group position statements.

### A. Opinions Related to Design and Biocompatibility

The plaintiffs argue that Dr. Babkowski's background in pathology does not qualify him under Federal Rule of Evidence 702 to render an opinion on the design of the mesh products that are the subject of this litigation; specifically, his opinions on the biocompatibility of polypropylene. *See* Notice of Adoption of Prior Daubert Mot. of Robert Babkowski, M.D. for Waves 4 & 5, Ex. 1 ("Pls.' Mem. in Supp."), at 2 [ECF No. 4539-1]. Because Dr. Babkowski is not a biomaterials expert and has never performed mechanical or chemical testing on polypropylene mesh, the plaintiffs claim that he is not qualified to put forth an expert opinion on such matters.

In *Tyree v. Boston Scientific Corp.* and *Sanchez v. Boston Scientific Corp.*, I assessed a similar argument. No. 2:12–cv–08633, 2014 WL 5486694, at *15 (S.D. W. Va. Oct. 29, 2014); No. 2:12–cv–05762, 2014 WL 4851989, at *20 (S.D. W. Va. Sept. 29, 2014). In each of these cases, the moving party sought the exclusion of Dr. Trepeta, a pathologist, proffered to testify on the general pathology of vaginal mesh implantation. The parties raise comparable arguments here, and, in many respects, the qualifications of Dr. Babkowski and Dr. Trepeta[1] – for purposes of a *Daubert* analysis – are not materially different. Specifically, I stated:

> In making [its] argument, however, [the moving party] downplays Dr. Trepeta's knowledge, training, and

---

[1] Of note, in both *Tyree* and *Sanchez*, the non-moving party sought to proffer Dr. Trepeta as an expert on the general pathology of vaginal mesh implantation *and* on the specific pathology of a another multidistrict litigation plaintiff. Here, the court is only reviewing Dr. Babkowski's qualifications to testify as an expert on the general pathology of vaginal mesh implantation.

7

> experience as a clinical pathologist. In general, a clinical pathologist "will be knowledgeable in the areas of chemistry, hematology, microbiology, . . . serology, immunology, and other special laboratory studies." 33 Am. Jur. *Trials* § 17 (1986); *see also* Coll. of Am. Pathologists, *CAP Fact Sheet,* http://www.cap.org ("[Clinical pathologists] are involved in a broad range of disciplines, including surgical pathology, cytopathology, . . . clinical chemistry, microbiology, immunopathology, and hematology."). Dr. Trepeta's thirty years' experience as a clinical pathologist therefore demonstrates sufficient knowledge to provide expert testimony about the chemistry and surgical pathology of materials like transvaginal mesh. . . .
>
> Dr. Trepeta's extensive experience and knowledge in the field of pathology qualify him to submit these opinions [regarding the human clinical response to polypropylene mesh]. Part of pathology involves reaching a diagnosis through "clinical and pathologic correlation." . . . Dr. Trepeta frequently engages in this process by providing clinical consultations to physicians, which require him to examine clinical information (through specimens, reports, or physician findings) and reach a pathologic diagnosis about a patient. . . . Dr. Trepeta applied this pathologic process in reaching his conclusions about the human clinical responses to polypropylene vaginal mesh. . . . He also compared medical literature to these observations and concluded that his pathological findings "are well described in the published literature."

No. 2:12–cv–08633, 2014 WL 5486694, at *15 (S.D. W. Va. Oct. 29, 2014) (citing No. 2:12–cv–05762, 2014 WL 4851989, at *20 (S.D. W. Va. Sept. 29, 2014)). While the parties in this case have not relied on precisely the same arguments, my reasoning and conclusions from *Tyree* and *Sanchez* still govern. Furthermore, to the extent that there are differences in fact and exhibits, the court does not find them sufficiently material. I **ADOPT** the reasoning articulated in *Tyree* and *Sanchez* and **FIND** that Dr. Babkowski is qualified to offer expert testimony on the biocompatibility of

polypropylene, or opine on the relationship between design characteristics and the physiological response in patients.

The plaintiffs next challenge the reliability of Dr. Babkowski's opinions concerning the purported degradation of polypropylene. According to the plaintiffs, Dr. Babkowski's opinion that polypropylene does not degrade *in vivo* represents nothing more than an *ipse dixit* statement, and thus is inadmissible. In support, the plaintiffs cite Dr. Babkowski's deposition testimony, wherein he states:

> Q: So you acknowledge that there is competing scientific literature on the concept that polypropylene mesh does, in fact degrade, right?
>
> A: I have acknowledged that, yes.
>
> Q: And so if I wanted to talk to you about the reasons why you elected to reject the conclusions of some of these authors in favor of your opinions on degradation, or the fact that it does not exist, you would tell me "I just can't tell you at this time, Mr. Lundquist"?
>
> A: When someone tells me that a product degrades, I would like to see it degrade. . . . I have spent 25 years looking at human tissue. I have seen plenty of polypropylene product. I have not seen degradation of polypropylene product. Thank you.
>
> Q: If you haven't seen it, it must not exist, then?
>
> A: It's only been 25 years. I'm sure there's a unicorn somewhere, and I'm sure I will eventually see one.

Pls.' Mem. in Supp., at 5.

In response, Bard claims that Dr. Babkowski's opinion is based on his twenty-five years of pathological experience and his review of the reported "list of literature and documents," "the reports of Plaintiffs' pathology experts" and "the scientific literature upon which they relied." *See* Notice of Adoption of Bard's Prior Resp. in

Opp'n to Pls.' Mot. to Exclude or Limit the Ops. of Robert Babkowski, M.D. for Wave 4 & Wave 5 Cases, Ex. B ("Bard's Resp. in Opp'n"), at 8-9 [ECF No. 4637-2]. In other words, Bard claims that Dr. Babkowski's testimony concerning the absence of degradation follows a reliable methodology consistent with his every day practice and supported by academic literature.

An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead "selectively [chooses] his support from the scientific landscape." *In re Rezulin Products Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (internal quotation marks omitted). "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Id.*; *see also Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011) ("A scientist might well pick data from many different sources to serve as circumstantial evidence for a particular hypothesis, but a reliable expert would not ignore contrary data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." (internal quotation marks omitted)); *Rimbert v. Eli Lilly & Co.,* CIV 06–0874 JCH/LFG, 2009 WL 2208570, at *14 n.19 (D.N.M. July 21, 2009) ("[A]n expert who chooses to completely ignore significant contrary epidemiological evidence in favor of focusing solely on non-epidemiological studies that support her conclusion engages in a methodology that courts find unreliable."), *aff'd,* 647 F.3d 1247 (10th Cir. 2011).

In *Tyree v. Bos. Sci. Corp.,* 2014 WL 5320566, No. 2:12–cv–08633, at *7 (S.D. W. Va. Oct. 17, 2014), the challenging party cited to particular portions of a particular expert's deposition testimony where he was asked about specific studies contrary to his opinion and, then, dismissed them in a conclusory manner without a scientific basis. Here, Dr. Babkowski explains in his expert report his reasons for deviating from certain opposing literature on the topic of degradation. *See* Pls.' Mem. in Supp., Ex. 1 ("Dr. Babkowski's Expert Report") at 21 (critiquing competing conclusions reached by Dr. Klosterhalfen, Dr. Babensee, and Dr. El-Ghannam).

While he failed to articulate his opinions during deposition carefully, Dr. Babkowski's mere statement that he has not seen any evidence of degradation is hardly equivalent to a conclusory dismissal of refuting studies given the explanations presented in his report. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (observing that "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion"). To the extent Dr. Babkowski's deposition testimony reflects poorly on his ability to differentiate his conclusions from competing opinions clearly, the plaintiffs are free to explore these deficiencies on cross-examination. *See McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 40 (D.D.C. 2004) (stating that the inconsistencies or misstatements in an expert's testimony "go to credibility, rather than *Daubert*'s standard of admissibility").

Therefore, I decline to exclude Dr. Babkowski's opinion on degradation solely for failing to recall his reported explanations during his deposition testimony. *See id.*

("Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered."); *Kingsley v. Brenda & Gene Lummus, Inc.*, No. 1:11-CV-32, 2012 WL 727091, at *7 (W.D.N.C. Mar. 6, 2012) (stating that *Daubert* requires at bottom an "explanation . . . sufficient to permit others with similar training and experience to review his opinions and subject them to scientific testing").

Therefore, the plaintiffs' motion on this point is **DENIED**.

### B. Opinions Regarding Mesh/Tissue Contraction

The plaintiffs argue that Dr. Babkowski's opinions regarding mesh or tissue contraction should be excluded because, in part, he acknowledges in his deposition testimony that he is not an expert on contraction. In *Wise*, I considered a similar argument and held that:

> This single statement from hundreds of pages of deposition does not overcome Dr. Austin's undeniable expertise as a pathologist. His training and experience in this field equips him to examine tissue and to opine about the tissue's pathology, including its reactions with other present substances, such as mesh. *See, e.g.*, 33 Am. Jur. *Trials* 467, § 17 (1986) ("Clinical pathology is the area of pathology that deals with testing of various body fluids and excreta in an attempt to correlate changes found in those fluids with the presence and development of disease processes."); *id.* § 27 ("Upon receipt of the specimen it is necessary to begin a series of steps that will eventually allow the [] pathologist to establish or confirm a diagnosis based on the specific pathology of the tissue.").

*Wise v. C. R. Bard, Inc.*, No. 2:12-cv-01378, 2015 WL 570070, at *5 (S.D. W. Va. Feb. 11, 2015). Again, to the extent there are differences in fact and exhibits, the court does not find them sufficiently material. I therefore **ADOPT** the reasoning articulated

in *Wise* and **FIND** that Dr. Babkowski is qualified to opine on the pathology of mesh explants, which includes an analysis of the foreign body response and how a wound heals around mesh.

Next, the plaintiffs challenge the reliability of Dr. Babkowski's contraction opinion because he relies on only two studies and because it is contrary to Bard's own internal documents.

On this point, the court is not convinced that Dr. Babkowski's contraction opinion derives entirely from two sources, nor is it clear that the citation to only two sources of supporting literature itself constitutes an unreliable scientific method. Under *Daubert*, "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." (citing *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001))). Furthermore, the plaintiffs' appeal to "numerous published, peer-reviewed articles of which the Court is aware" that "establish beyond reasonable scientific dispute the general acceptance of *in vivo* mesh shrinkage" offers little justification to issue a blanket exclusion without more specificity. Pls.' Mem. in Supp., at 9. Likewise, the plaintiffs' disagreement with the evidence supporting Dr. Babkowski's conclusions can be explored on cross-examination.

Thus, the plaintiffs' motion on this point is **DENIED**.

### C. Specific Causation and Case Specific Opinions

As noted above, the instant motion pending before the court is presented as a "Notice," wherein the plaintiffs adopt and incorporate by reference a *Daubert* motion and its corresponding documents filed in a previous case. As a result, certain aspects of this reinstituted motion are irrelevant to Bard Wave 4 or Wave 5 cases, such as testimony pertaining to specific plaintiffs situated in prior waves. Therefore, the plaintiffs' motion on the admissibility of Dr. Babkowski's opinions regarding specific plaintiffs is **DENIED as moot**.

### D. Adequacy of the Instructions for Use IFU

Next, the plaintiffs seek to prevent Dr. Babkowski from testifying on the adequacy of Bard's warnings contained in its IFU because Dr. Babkowski, a pathologist, is not qualified to render an expert opinion on the adequacy of the IFU. I agree.

Without additional expertise in the specific area of product warnings, a doctor, such as a pathologist, is not qualified to opine on the adequacy of a product warning IFU merely because of his experience reviewing product inserts or reviewing the actions of gynecologists. Accordingly, the plaintiffs' motion on this point is **GRANTED.**

### E. Opinions Related to MSDSs

Next, the plaintiffs seek to prevent Dr. Babkowski from testifying on the utility and interpretation of language contained in MSDSs. As I have previously held, the pertinent issue is not whether doctors rely on or heed MSDS warnings for the raw

materials Bard uses to manufacture its medical devices. *See Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 507, 577 (S.D. W. Va 2014 (excluding a doctor's opinions on the MSDS because "[a] narrative review of the history and development of MSDSs and who uses them in the field is not helpful to the jury"). Nevertheless, I acknowledge the need for rebuttal testimony based on what the plaintiffs present at trial. Accordingly, I **RESERVE** ruling on the admissibility of Dr. Babkowski's MSDS opinions for trial.

### F. FDA Clearance

According to the plaintiffs, Dr. Babkowski opines on the purpose of the FDA clearance process and purported conclusions made by the FDA on the mesh devices. I agree that this testimony is inadmissible. This case concerns state tort law, not federal regulatory law, and as such, a recap of an FDA panel's findings will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702. Indeed, discussion of the FDA panel's position through an expert witness could lead to more confusion than enlightenment. The jurors may erroneously believe that the FDA's "stance" relates to the validity of the plaintiffs' state law tort claims, or they may attach undue significance to the FDA panel's determination. Therefore, finding the probative value of this testimony to be substantially outweighed by the risk of misleading the jury, I **EXCLUDE** Dr. Babkowski's opinions and testimony related to the FDA. *See* Fed. R. Evid. 403; *see also Daubert*, 509 U.S. at 595 (emphasizing that courts must keep the other evidentiary rules in mind when evaluating the admissibility of expert opinions because expert evidence can be "both

powerful and quite misleading"). The plaintiffs' motion on this point is therefore **GRANTED**.

### G. Position Statements

Finally, the plaintiffs object to Dr. Babkowski's opinions regarding the AUGS/SUFU Position Statement. The AUGS/SUFU Position Statement, according to the plaintiffs, is irrelevant, unreliable, and includes improper legal opinions. As an initial matter, I agree that Bard cannot use Dr. Babkowski as a mouthpiece for the AUGS/SUFU Position Statement—simply reading a document into evidence does not require "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Nor can Dr. Babkowski represent to the jury that the AUGS/SUFU Position Statement embodies a legal conclusion or a standard of care. *See United States v. McIver*, 470 F.3d 550, 572 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard . . . is generally inadmissible."). To the extent Dr. Babkowski seeks to use the AUGS/SUFU Position Statement in this manner, his opinions are **EXCLUDED**.

The plaintiffs also appear to argue that position statements published by medical groups or societies cannot form a reliable scientific basis for any expert opinion because they are litigation-driven and void of scientific analysis. *See* Pls.' Br. in Supp., at 20. Even if this is true, the unreliability of one source used by an expert in reaching his opinion does not call for the exclusion of that opinion altogether, assuming the expert considered other reliable sources in his methodology. Therefore, to the extent the plaintiffs seek to exclude any of Dr. Babkowski's opinions merely because he relied, in part, on a position statement, their motion is **DENIED**

## IV. Conclusion

To summarize, I **GRANT in part, RESERVED in-part** and **DENY in part** the plaintiffs' Notice of Adoption of Prior Daubert Motion of Robert Babkowski, M.D. for Waves 4 and 5 cases [ECF No. 4539], which this court construed as a motion, consistent with my reasoning above.

The court **DIRECTS** the Clerk to file a copy of this Memorandum Opinion and Order in 2:10–md–2187, and the Bard Wave 4 and Wave 5 cases identified in the Exhibit attached hereto. The court further **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 5, 2018

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

# Exhibit A

| CIVIL ACTION NUMBER | Case Name |
|---|---|
| 2:14-cv-03439 | Kitchen v. C. R. Bard, Inc. et al. |
| 2:14-cv-18890 | McManus v. C. R. Bard, Inc. et al. |
| 2:14-cv-21874 | McCray v. C. R. Bard, Inc. et al. |
| 2:14-cv-23401 | Barber v. C. R. Bard, Inc. et al. |
| 2:14-cv-28943 | Smith et al. v. C. R. Bard, Inc. et al. |
| 2:16-cv-01855 | Eiffler v. Sofradim Production SAS et al. |